UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MORDECAI KLEIN, an individual, and | : | |
| CHAIM MEYER KLEIN, an individual | : | : |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | CASE NO.: _____ |
| | : | |
| DEUTSCHE LUFTHANSA AG d/b/a | : | CIVIL COMPLAINT |
| LUFTHANSA AIRLINE, FRANKFURT | : | |
| AIRPORT, and | : | : |
| FRAPORT AG FRANKFURT AIRPORT | : | |
| SERVICES WORLDWIDE | : | DEMAND FOR JURY TRIAL |
| | : | |
| | : | |
| Defendants | : | |
| | : | |
| _____/ | | |

**COMPLAINT**

COMES NOW, Plaintiffs MORDECAI KLEIN and CHAIM MEYER KLEIN, through legal counsel, SCOTT LEVENSON, ESQ., LEVENSON LAW GROUP, and brings this action based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigations of their attorneys.

**I. OVERVIEW**

1. This lawsuit revolves around Lufthansa Flight 401 from JFK Airport in New York to Frankfurt Airport in Germany and the connecting Lufthansa Flight LH1334 from Frankfurt, Germany to Budapest, Hungary on May 4th, 2022.

2. This lawsuit concerns itself with two Jewish individuals, Plaintiffs Mordecai Klein and Chaim Meyer Klein, travelling to a small village in northeast Hungary for an annual memorial commemorating a Rabbi Yeshaya Steiner of Kerestir, who died in 1925.

3. This lawsuit concerns itself with two Jewish individuals, in the company of approximately 170 Jews flying Lufthansa Airline, who landed at Frankfurt Airport in Germany, arriving from JFK in New York, were then prevented from boarding the connecting Lufthansa Flight LH1334 to Budapest for the memorial.

4. This lawsuit concerns itself with the *racial profiling* and *discrimination* against a large group of Jewish individuals by a German airline at a German airport operated by another German company, Arbeit Macht Frei.

## II.  PARTIES

5. Plaintiff Mordecai Klein is an individual residing in the Eastern District of New York;

6. Plaintiff Chaim Meyer Klein is an individual residing in the Eastern District of New York.

7. Defendant Deutsche Lufthansa AG is, upon information and belief, doing business as Lufthansa Airlines.  Deutsche Lufthansa AG is located at Venloer Strasse 151-153 Koein, 50672 Germany with Lufthansa and has Headquarters located in Cologne, Germany and located at P.O. Box 425, East Meadow, N.Y. 11554 USA.

8. Defendant Frankfurt Airport is an international airport in Germany (Code FRA), with an address of 60547 Frankfurt, Germany.  Defendant Frankfurt Airport is operated by Defendant Fraport.

9. Defendant Fraport AG Frankfurt Airport Services Worldwide ("Fraport", "Fraport Group") is a German business "group" with headquarters at Frankfurt Airport Frankfurt

am Main, Hesse, Germany.  Fraport USA Headquarters are located at 7062 Friendship

Road., #201, Baltimore, Maryland 21240 and Fraport New York, Inc. is located at JFK

International Airport, Terminal 5, Jamaica, New York 11430 and New York Liberty

International Airport TB.

### III. JURISDICTION AND VENUE

10. The Court has subject matter jurisdiction over the claims of this legal action because the

matter in controversy exceeds the sum of $5 million, exclusive of interest and costs; the

Plaintiffs are residents of the area of jurisdiction, and Defendants regularly conduct

business in the New York area and have established "headquarters" in the New York

area.

11. The Court has personal jurisdiction over Defendants Deutsche Lufthansa AG and Fraport

Group because Plaintiffs' claims arise out of the business activities of those Defendants

conducted in the State of New York.  Additionally, Defendant Frankfurt Airport is

operated by Fraport.

12. Venue is proper because Defendants conduct a significant amount of business in this

district and because Defendants have substantial contacts in this District.

### IV. ALLEGATIONS COMMON TO ALL COUNTS

13. Plaintiffs' destination was Budapest. They were traveling from JFK International Airport

to Frankfurt Airport, and ultimately arriving in Budapest on Lufthansa FL401/LH1334.

14. Plaintiffs' destination was part of an annual "memorial pilgrimage" commemorating

Rabbi Yeshaya Steiner of Kerestir, who died *3 Iyar yahrzeit* (May 4th) in 1925.  Reb

Shayala Kerestirer ("R'Shayele") was known for kindness, warm hospitality and for his

miraculous blessings.  The stories of his miraculous blessings could "revive" individuals

– even to present day.  The true gift of R'Shayele was his ability to help people who had "lost their way" in the Jewish world. R'Shayele helped people to find themselves again in order to continue on in life with purpose.

15. Kerestir, Hungary had a tiny Jewish community that was almost completely wiped out in the Holocaust.

16. After a two-year hiatus, due to the pandemic and travel bans worldwide, *tens of thousands* were expected to Mark the Yahrzeit of Rabbi Yeshaya of Kerestir.

17. On May 4, 2022, the travelers began their trip from JFK International Airport on Flight 401, the first leg of the flight.   The pilot announced that the flight attendants were frustrated with passengers who were refusing to comply with the mandatory mask requirement and with people blocking the aisles to pray.

18. German carrier, Lufthansa, requires passengers and crew to wear a medical-grade mask on flights.  Although masks are no longer mandated on U.S. airlines and airports, they are still suggested when around large groups of people in tight areas.  The mask mandate at Frankfurt Airport expired in early April 2022.  Lufthansa Airline, as it had the right to do, continued with its mask requirements.

19. It is important to note that **Plaintiffs, and many other Jewish travelers, complied with the mask requirements of Lufthansa Airlines.**

20. Upon arriving at the gate in Frankfurt, passengers on Flight 401 noticed about 2 dozen police officers.  The Federal Police at Frankfurt Airport stated in an email that their presence was "preventative."  No one was arrested from the originating flight because the officers were unable to identify the travelers who had flouted the rules.

21. Plaintiffs were anticipating the second leg of the trip from Frankfurt to Budapest and the Lufthansa desk began calling passenger's names to board.  Individuals who did not appear to be Jewish or did not appear to have Jewish names were allowed to board.

22. Individuals, including Plaintiffs, whose names was not "outwardly" Jewish were called and then rejected after they were seen – and it was determined by their dress and appearance (the unique appearance of the Hasidic Jew) that they were Jews.

23. Plaintiffs and the other Jewish passengers, once on their way to the memorial ceremony in Hungary, received the announcement stating that the remaining travelers would not be included on the flight and the travelers were banned from the airline for the day.  Chaos ensued as Jewish travelers attempted to make new plans under the time constraints of the memorial ceremony.

24. A security guard was posted by the customer service counter to keep the Jewish travelers away for the remainder of the day.

25. Lufthansa spokesperson Tal Muscal stated that he did not know who made the decision to bar passengers from their connecting flight.

26. A video posted online offers the explanation a Lufthansa gate agent provided when the connecting flight departed, leaving behind three-quarters of its passengers: "Due to an operational reason coming from the flight from New York, all passengers here, we have to cancel you on this flight," the agent said.  **"You know why it was."**

27. Another video shows passenger Yitzy Halpern speaking with a Lufthansa employee in customer service.  Halpern is wearing a dark, long-sleeve shirt with a yarmulke (a skullcap) on his head.  "I was wearing a mask the whole time," Halpern said, "Why am I lumped in with them?"  The Lufthansa representative replied, **"Everybody has to pay**

**for a couple"** who didn't comply with mask rules. **"It was Jewish people who were the mess, who made the problems."** Halpern, whose grandparents were Holocaust survivors, told the representative that picking out all Jews was "gruesome" and antisemitic. The Lufthansa representative replied, **"It would have been [the same] if you were African or Polander."**

28. It is important to discuss the history and current situation facing many Jewish people in order to fully understand the distress that these actions caused Plaintiffs, as well as their fellow Jewish travelers. There are many groups of individuals that would have received widespread public, and even government, support had they been barred from traveling based only upon belonging to that specific group. Unfortunately, as the era of a Second Holocaust falls upon us, there is "Silence" once again. The world stands still, doesn't make a sound. Standing up for Jews in the face of Blatant Antisemitism is not politically popular for a vast majority of the public, as well as many of our elected officials, even the so-called Jewish ones.

29. Jewish Kapos played a pivotal role in the history of the Holocaust. Imprisoned in concentration camps, Kapos were enemies and victims of the Nazis; they were **Jewish inmates who were forced by the Nazis to serve as "stand-in" guards**. In effect, being a Kapo blurred the lines between collaborator, perpetrator and victim. We find that that line is once again blurred with Jewish elected officials in Congress and the Senate. They no longer have their own identity but speak up on behalf of many other groups involving hate and discrimination in this country as long as it will ensure they keep their seat. Speaking up about hate and discrimination for their own people is not politically correct

at this time in history and might affect their positions, so they let it go, until of course the mob comes for them and then there is no one left to speak up.

30. Three people in economy class were reprimanded on Flight 401 by flight attendants for refusing to wear masks.  One was Jewish and wearing a baseball cap.  **The others were a man and a woman seated together and speaking German.** Even passengers who had flouted the mask rule, but did not outwardly appear Jewish, were allowed to board the plane and continue their travels.

31. Plaintiffs, and many fellow Jewish travelers, knowing they would be prevented from continuing their trip on Lufthansa LH1334 attempted to take alternative routes, paying hundreds of dollars for new flights on LOT Polish Airlines, buses, taxis, etc.  Some would re-book on other Lufthansa flights after paying a fare difference **because Flight 1334 had not been cancelled.**

32. Plaintiffs, and many Jewish travelers, arrived at their destination too late for the memorial ceremony.

33. Plaintiffs, and many Jewish travelers, had to pay for a new flight home, since they had not completed the outbound flight on Lufthansa – invalidating their return ticket.

34. The memorial ceremony for Rabbi Yeshaya Steiner of Kerestir will inevitably continue in the coming years.  R'Shayele, his actions, memories and stories continued to produce such miraculous results so many years after his passing. However, the actions of Defendants have come at a time in history where Antisemitism is at its highest level since WWII and recent studies suggest that over 60% of Jews believe that there will be another Holocaust in their lifetime. This Antisemitism also came from German Corporations who notoriously used Jews as Slave Labor during the Holocaust and of course this Antisemitic

episode came from people speaking German, which furthered the trauma caused by and related to this incident, a very real reminder that Arbeit Macht Frei and the Hitler Youth is alive and well.

35. The Holocaust still triggers such fear and anger so many years after the war's conclusion. As the children and grandchildren of those survivors have relived those horrors with their Parents and Grandparents.

36. This is Antisemitism through racial & religious profiling and disrupted a memorial celebration – a ceremony in memory of a kind and inspirational person.

## V.  LEGAL BASES FOR RELIEF

### COUNT I

### All Defendants – Discrimination based on Race
### Title VI of the Civil Rights Act of 1964

37. Plaintiffs incorporate by reference Paragraphs 1 through 36 as if more fully set forth herein.

38. Title VI of the Civil Rights Act of 194 prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives Federal funds or other Federal financial assistance.

39. On December 11, 2019, President Trump issued an executive order stating in section one that, "It shall be the policy of the executive branch to enforce Title VI against prohibited forms of discrimination rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI."

40. This executive order continues in section two by stating, "Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews.  Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish

individuals and/or their property, toward Jewish community institutions and religious

facilities"

41. As an ethnoreligious group, the Jewish people traveling on Lufthansa FL 401/1334 were

discriminated as a race of people who were being prevented, as a group, from flying on

their connecting flight from Frankfurt Airport to Budapest, Hungary.

42. Defendants breached their duty by intentionally profiling Plaintiffs based off of their race

and national origin thereby preventing Plaintiffs and other Jewish travelers from

continuing with their flight from Frankfurt Airport to Budapest, Hungary solely because

they were Jewish – and especially because many of them were Hasidic Jews.

43. Defendants intentionally continued with their discriminatory actions and inactions after it

was determined their behaviors towards the Plaintiffs and other Jewish travelers was not

substantiated.

44. Defendants provided a hostile environment towards the Jewish travelers by bringing in

armed security and police presence for the sole purpose of containing the Jews and

preventing them from continuing on the connecting flight to their final destination in

Budapest, Hungary.

45. An employer is vicariously liable for its employee's negligent or intentional acts if those

acts are committed within the scope of the employee's employment, and the conduct is

generally foreseeable and a natural consequence of the employment. *Adams v. NYC Tr.*

*Auth.,* 88 N.Y.2d 116 (1996*)*. This vicarious liability is expanded even further for

common carriers for the torts committed by their employees as carrier's have an "implicit

contract with its passengers, which was held, as a matter of law, to require the carrier to

transport its passengers "`safely and properly, and to treat [them] respectfully'" *Id. citing Goddard v Grand Trunk Ry.*, 57 Me 202).

46. The harassment towards the Jewish travelers was motivated by race and religion and the conduct of the employees was pervasive and severe.  The conduct of the Defendants, through their employees, had a detrimental effect on the Plaintiffs and the harassment would have had a significant effect on a reasonable person of the same religion in the position.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count I of the Complaint against all Defendants in compensatory damages in an amount that is fair and reasonable to compensate the Plaintiffs for their damages, including but not limited to the recoupment of all monies paid, treble damages, costs of the suit, and reasonable attorney's fees and costs.

**COUNT II**

**All Defendants – Discrimination based on Religion**
**Title VII of the Civil Rights Act of 1964**

47. Plaintiffs incorporate by reference Paragraphs 1 through 44 as if more fully set forth herein.

48. Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on religion. As an ethnoreligious group, the Jewish people traveling on Lufthansa FL 401/1334 were discriminated as a race of people who were being prevented, as a religious group, from flying on their connecting flight from Frankfurt Airport to Budapest, Hungary.

49. Defendants breached their duty by preventing Jewish travelers from continuing with their flight from Frankfurt Airport to Budapest, Hungary solely because they were Jewish – and especially because they were Hasidic Jews.

50. Defendants were negligent by continuing with their discriminatory actions and inactions after it was determined their behaviors towards the Jewish travelers was not substantiated.

51. Defendants provided a hostile environment towards the Jewish travelers by bringing in armed security and police presence for the sole purpose of containing the Jews and preventing them from continuing on the connecting flight to their final destination in Budapest, Hungary.

52. Defendants are responsible for the actions of their employees.  The harassment towards the Jewish travelers was motivated by race and religion and the conduct of the employees was pervasive and severe.  The conduct of the Defendants, through their employees, had a detrimental effect on the Plaintiffs and the harassment would have had a significant effect on a reasonable person of the same religion in the position.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count II of the Complaint against all Defendants in compensatory damages in an amount that is fair and reasonable to compensate the Plaintiffs for their damages, including but not limited to the recoupment of all monies paid, treble damages, costs of the suit, and reasonable attorney's fees and costs.

## COUNT III

### All Defendants – Anti-Semitism (Racial Bias)
### 22 U.S.C. §§ 2731 & 6412

53. Plaintiffs incorporate by reference Paragraphs 1 through 45 as if more fully set forth herein.

54. The Department of State houses an *Office to Monitor and Combat anti-Semitism* under 22 U.S.C. § 2731.  The Special Envoy shall have the rank of Ambassador and advise and coordinate efforts to monitor and combat anti-Semitism and anti-Semitic incitement that occurs in foreign countries.

55. The nature and extent of acts of anti-Semitism and anti-Semitic incitement are described and assessed for inclusion in the annual Country Reports on Human Rights Practices.

56. Anti-Semitism is assessed and reported under 22 U.S.C. § 6412 regarding violations of religious freedom in any foreign country.  Violations include (A) arbitrary prohibitions on, restriction of, or punishment for – (i) assembling for peaceful religious activities such as worship, preaching and prayer; (ii) speaking freely about one's religious beliefs.

57. Plaintiffs, and the majority of the other travelers on the Lufthansa airline FL 401/1334, were Jews and most were distinguished by their dress and hair "locks" as Hasidic Jews. They were separated from the other travelers like sheep and not allowed to fly on the previously ticketed Lufthansa flight to Budapest, Hungary.

58. Furthermore, Jewish travelers who attempted to continue to their destination on other Lufthansa flights were charged extra fee and not given credit for "return tickets."


WHEREFORE, Plaintiffs pray for judgment in their favor on Count III of the Complaint against all Defendants in compensatory damages in an amount that is fair and reasonable

to compensate the Plaintiffs for their damages due to the anti-Semitic actions and

inactions, including but not limited to the recoupment of all monies paid, treble damages,

costs of the suit, and reasonable attorney's fees and costs.

## COUNT IV

### All Defendants – Emotional Distress

59. Plaintiffs incorporate by reference Paragraphs 1 through 52 as if more fully set forth

herein.

60. Under New York law, a party who has been subjected to "'conduct . . . so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and

to be regarded as atrocious, and utterly intolerable in a civilized community'" is entitled

to prove a claim for intentional infliction of emotional distress. *Murphy v. Am. Home

Products Corp*., 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236 (1983) (*quoting*

Restatement (Second) of Torts § 46, subd. [1], Comment d); *Fischer v. Maloney*, 43

N.Y.2d 553, 557-58, 402 N.Y.S.2d 991, 992-93 (1978) (acknowledging a cause of action

for intentional infliction of emotional distress in New York).

61. To recover for intentional infliction of emotional distress, a plaintiff must establish four

distinct elements, including 1) extreme and outrageous conduct; 2) intent to cause, or

disregard of a substantial probability of causing, severe emotional distress; 3) severe

emotional distress; and 4) a causal connection between the conduct and a cognizable

injury. *Howell v. New York Post Co., Inc*., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353

(1993).In this action, it has been documented that Defendants held Plaintiffs as well as a

group of Jewish travelers with them at bay, assisted by security and police armed with

guns-ready, for the sole purpose of preventing the Jewish travelers from completing the

second, and final leg., of their journey to a memorial ceremony. This behavior was extreme and outrageous and Defendants, through its agents, disregarded the substantial probability that this would cause severe emotional distress to Plaintiffs.

62. Plaintiffs and the Jewish travelers with them were individuals who became a group due to their common destination and their common purpose – to commemorate the life of an inspirational person.

63. Due to the deliberate actions and inactions of the Defendants, Plaintiffs, and many of the Jewish travelers would arrive after the ceremony had concluded – or not at all. As a result of the Defendants extreme and outrageous behavior, Plaintiffs have experienced severe emotional distress, particularly given the spiritual connection with fellow Jewish travelers and the historical treatment of the Jewish people, specifically within Germany.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count IV of the Complaint against all Defendants in damages for emotional distress caused by Defendants in their anti-Semitic "exercise" on May 4th, 2022.

## COUNT VI

### All Defendants – Breach of Contract

64. Plaintiffs incorporate by reference Paragraphs 1-57 as if more fully set forth herein.

65. Plaintiffs entered into an enforceable agreement with Defendants upon purchase of their airline ticket wherein they paid money to purchase said ticket, thereby fulfilling their obligations under the contract. Plaintiffs dd so with the understanding that the Defendants would fulfill their obligation to ensure that Plaintiffs would be able to fly to their

destination as scheduled, absent unforeseen circumstances beyond the Defendants control.

66. The Defendants violated this agreement when they refused to allow Plaintiffs to fly to their destination, despite the fact that is within the control of the Defendants to do so and Plaintiffs had not violated any policy of the airline.

67. As a result of Defendants breach of contract, Plaintiff incurred damages including actual damages, the cost of their airline ticket, and consequential damages.

**COUNT VI**

**All Defendants – Punitive Damages**

68. Plaintiffs incorporate by reference Paragraphs 1 through 61 as if more fully set forth herein.

69. There exists a general standard that applies in connection with awards of punitive damages. See Whitney v. Citibank, N.A., 782 F.2d 1106, 1118 (2d Cir. 1986) (citing *Walker v. Sheldon*, 10 N.Y.2d 401, 404-05, 223 N.Y.S.2d 488, 490-91 (1961)) (indicating that punitive damages are appropriately awarded in the event of a showing that a defendant's actions were willful, wanton and maliciously committed); *see also Luessenhop v. Clinton County*, New York, No. 04-CV-263, 1007 WL 1063650, at *9 (N.D.N.Y. Apr. 6, 2007) (Treece, M.J.); *Lambrinos v.Exxon Mobil Corp*., No. 00-CV-1734, 2004 WL 2202760, at *8 (N.D.N.Y. Sept. 29, 2004).

70. An award of punitive damages is intended to advance the important state interests of deterrence and retribution. *State Farm Mut. Auto. Ins.Co. v. Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 1519 (2003). The factors to be considered when awarding punitive damages include "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio

of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575, 116 S. Ct. 1589 (1996)); *see also Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006).

71. Punitive damages, or exemplary damages, are damages assessed  to punish the Defendant(s) for outrageous conduct and/or to reform or deter the Defendant(s) and others from engaging in conduct similar to that which formed the basis of the lawsuit.

72. The record for the day at Frankfurt Airport on May 4th, 2022,demonstrates, through clear and convincing evidence, that Defendants were guilty of intentional misconduct of an anti-Semitic nature, in Germany and with armed guards and police in the wings.

73. Defendants, through their employees, sought to maliciously oppress a group of Jewish travelers on their way to a memorial ceremony.

74. Defendants' behavior was egregious.


WHEREFORE, Plaintiffs pray for judgment in their favor on Count V of the Complaint against all Defendants in punitive damages in an amount of three million ($3,000,000.00) dollars per Plaintiff, plus costs of the suit, and reasonable attorney's fees and costs.


Dated: May 19, 2022
New York, NY                                              Respectfully submitted,


                                              *Scott C. Levenson*
                                              Scott Levenson, Esq.
                                              Levenson Law, LLC
                                              625 W. 51st Street

New York, NY  10019
Tel: 347-352-2470
LevensonLawGroup@gmail.com
Attorneys for Plaintiffs