**LEVENSON LAW GROUP**
625 W. 51st Street
New York, NY 10019

VIA ECF

August 12, 2022

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

  **RE:**   *Klein, eta al. v. Deutsche Lufthansa AG, et al., Case No.: 1:22-cv-02957*

Dear Honorable Judge Cogan:

  We represent Plaintiffs in the above-referenced putative class action matter. Pursuant to the briefing schedule and in response to the July 29, 2022 letter brief submitted by Defendant Deutsche Lufthansa AG ("Defendant") (the "Brief") (ECF No. 10), Plaintiffs Chaim Meyer Klein and Mordecai Klein ("Plaintiffs" or the "Kleins") submit this letter brief in response thereto.

> This lawsuit revolves around Lufthansa Flight 401 from JFK Airport in New York to Frankfurt Airport in Germany and the connecting Lufthansa Flight LH1334 from Frankfurt, Germany to Budapest, Hungary on May 4th, 2022.

ECF No. 2 at ¶1.

  This lawsuit was commenced due to defendants' alleged discriminatory actions against the putative class members (including Plaintiffs) that prevented Plaintiffs and other Jewish people from embarking and reaching their destination (Budapest, Hungary) as outlined in the Amended Complaint (ECF No. 2). Plaintiffs brought the lawsuit on behalf of themselves and on behalf of all those similarly situation. Id. The Counts are: I Discrimination Based on Race; II Discrimination Based on Religion; III Anti-Semitism (Racial Bias); IV Emotional Distress; V Breach of Contract; and VI Punitive Damages.

  Plaintiffs allege Defendant's-performance of their obligations that prevented Plaintiffs from embarking on their connecting flight to Budapest only because of discriminatory motivation on the part of Defendant's agents and employees. The discrimination was based upon Plaintiffs' and other proposed class members appearing and being Jewish. Thus,

> This lawsuit concerns itself with the *racial profiling* and *discrimination* against a large group of Jewish individuals by a German airline at a German airport operated by another German company, Arbeit Macht Frei.

Id. at ¶4 (italics in the original). Absent in the Amended Complaint is a claim based upon the Montreal Convention. This is because: (1) no bodily injury is alleged; (2) the complained of actions did not occur in flight or embarking/disembarking a flight; and (3) there was no delay in the aircraft but rather Plaintiffs were not allowed to proceed to embarking process regarding their connecting flight to Hungary because of Defendant's discriminatory acts. The allegations are clear, the inferences strong, and most (if not all) of the cases cited by Defendant in its Letter Brief are inapposite as the facts are not the same, rendering the Montreal Convention and the cases inapplicable to the present circumstance.

"The Montreal Convention contains three damages provisions under which carriers may be held liable. *See Seagate Logistics, Inc. v. Angel Kiss, Inc*., 699 F. Supp.2d 499, 506 (E.D.N.Y. 2010). Article 17 provides for liability for the death or bodily injury of a passenger, if the injury occurred on board the aircraft or in the course of "any of the operations of embarking or disembarking," and for liability if checked baggage is destroyed, lost, or damaged. Montreal Convention, art. 17. Article 18 of the Montreal Convention states that, subject to certain exclusions, a carrier is liable for damage to cargo during carriage by air. Id., art. 18. Finally, Article 19 provides for carrier liability "occasioned by delay in the carriage by air of passengers, baggage or cargo" unless the carrier […]." *Alam v. Am. Airlines Group, Inc.*, 2017 U.S. Dist. LEXIS 389950, at *9 (E.D.N.Y. March 17, 2017). Plaintiffs' allegations do not concern embarking or disembarking a plane lost or destroyed personal property, or delay. The Montreal Convention does not apply as more fully explained herein.

The Second Circuit in Buonocore v. Trans World Airlines, Inc., 900 F.2d 8 (2nd Cir. 1990) employs a "flexible approach" when determining liability under the Montreal Convention (or its predecessor, the Warsaw Convention) Article 17 and analyzes liability under a multifactor test: (1) the activity the passengers at the time of the accident; (2) the restrictions, if any, on their movement; (3) the imminence of actual boarding; and (4) the physical proximity of the passengers to the gate. The Second Circuit found that there was no liability as the passenger was checked in but at the snack counter and could roam about as his flight was two hours later and he was not near the gate. Note that Buonocore also involved an accident, a terrorist attack, and death.

In the instant case, applying a flexible approach to facts that differ drastically from those concerning an accident, we can easily see that the Convention does not apply. No physical injuries are alleged. (1) Plaintiffs' activity could be construed as being part of a non-boarding process, however, due to the actions of Defendants' employees and/or agents, Plaintiffs were not free to move about as they had the threat of a police state. (2) Defendant restricted Plaintiffs' movements but not in a way that would lead to actually embarking on the flight; rather, the restriction led to Plaintiffs being barred from embarking and otherwise being racially profiled, lumped together, and held against their will in Frankfurt. (3) the boarding was imminent but not in the same way as other circumstances not involving racial profiling and prevention from embarking based upon racial and religious discrimination. (4) It was of no moment that Plaintiffs were near the gate:

2

Defendants' agents and employees told them they were not allowed to board their connection flight. The flexible test, when analyzed in a proper context shows that this was not embarking, disembarking, or on flight because Defendant prevent Plaintiffs from doing any of those things. It is the actions of the agents and employees of Defendant that lead to the logical, factual, and legal conclusion that the Montreal Convention does not apply here.

While it can be argued that, as Defendant cites, "**[w]hen operative**, it [the Montreal Convention] preempts all state law claims for damages against air carriers," the key words are bolded here, and the Montreal Convention must be applicable to the alleged facts. *King v. Am. Airlines*, 284 F.3d 352, 357 (2nd Cir. 2002) (emphasis added). The Second Circuit reasoned:

> At the time they were bumped from their flight, the Kings had already checked in for their flight, received their boarding passes, and boarded the vehicle that was to transport them from the terminal to the aircraft. In other words, not only were they "actively engaged in preparations to board the plane," *Buonocore*, 900 F.2d at 10, but they had progressed further in those preparations than had the plaintiffs in *Day* and *Evangelinos*. *See Ricotta v. Iberia Lineas Aereas de Espana*, 482 F. Supp. 497, 500 (E.D.N.Y. 1979) (ruling that a passenger injured in a bus transporting passengers from aircraft to terminal was injured in the course of disembarking an aircraft), aff'd, 633 F.2d 206 (2d Cir. 1980); *see also Barratt v. Trinidad & Tobago (BWIA Int'l) Airways Corp.*, 1990 U.S. Dist. LEXIS 20947, No. CV 88-3945, 1990 WL 127590, at *3 (E.D.N.Y. Aug. 28, 1990) (comparing plaintiff injured while descending a stairway to the tarmac with the Day passengers, wounded before they had even proceeded through the gate, in determining that the action was preempted by Article 17. The Kings therefore suffered their injury while "in the course of [one of] the operations of embarking" within the meaning of Article 17.

*Id*. at 359-360. Thus, the plaintiffs there were on the plane and cases cited therein the plaintiffs were embarking on the flight. Similarly other cases relied upon by Defendant suffer the same fate. *Vumbaca v. Terminal One Group Ass'n, L.P.*, 859 F. Supp.2d 343, 363-64 (E.D.N.Y.) (the plaintiff's claims for bodily injury were preempted by the Convention where **she alleged that she was trapped *on board the plane* for seven hours**); *Lynda v. JetBlue Airways Corp.*, No. 20-cv-487 (BMC), 2020 WL 3104069, at *2-*4 Defendant has put the cart before the horse (the complained of conduct was alleged to have occurred **on the plane**, and only the breach of contract claim under Article 19 was allowed to progress as a delay claim).

Contrast that with Plaintiffs in the instant case who were not allowed to proceed to the embarking process. Another case cited by Defendant, *Alam v. Am. Airlines Group, Inc.*, 2017 U.S. Dist. LEXIS 389950, at *9 (E.D.N.Y. March 17, 2017), also involved plaintiffs who complained of conduct that occurred on the plane. Specifically in *Alam*, the court relied on the plaintiffs' admission that "they were permitted to board the next flight home." *Id*. at *16. Thus, the plaintiffs there admitted that the defendant fulfilled their contractual obligations.

Plaintiffs here do not admit anything of the sort; rather they aver that they booked flights on other airlines, took buses, taxis, and other vehicular transportation, rebooked another Lufthansa flight to Hungary, and/or paid for <u>another</u> Lufthansa ticket back to New York. *See* ECF No. 2 at ¶¶33 -35. Interestingly, the *Alam* court highlighted a case very similar to the case herein, namely, *Mullaney v. Delta Air Lines, Inc.*, 2009 U.S. Dist. LEXIS 51039 (S.D.N.Y. June 3, 2009), which notes: "[…] in recent years a number of courts have concluded that **where the facts pleaded in the complaint add up to non-performance, rather than simply delay, the Convention does not preempt other claims.**" The facts outlined in the Amended Complaint, EF No. 2, are clearly more than "simply delay" and to argue otherwise is disingenuous. As in Mullaney, "[…] where the defendant airline did not ultimately transport the plaintiff, or where the plaintiff secured alternative transportation only after learning that he would not be flown by his original carrier, and where the plaintiff did not refuse to fly on a later flight operated by his carrier, a finding that the claim was for non-performance rather than delay would be warranted." As was the case in *Mullaney*, Defendant's attempt to preempt Plaintiffs' claims and its motion to dismiss must be rejected and denied because Defendant failed to perform its obligations. *See also In re Nigeria Charter Flights Contract Litig.,* 520 F. Supp. 2d. 447, 452-456 2nd Cir. 1990) (finding that where a plaintiff alleges nonperformance rather than delay Article 19 / the Convention does not apply); *contrast with New Fortune Inc. v. Apex Logistics Int'l (CN) Ltd.*, No. 21-262-cv, 2021 U.S. App. LEXIS 34924, at *6 (2d Cir. 2021) (affirming dismissal of claims pursuant to the Montreal Convention because neither the Second Circuit or the lower court "found in New Fortune's complaint an adequate claim of breach of contract or negligence amounting to nonperformance").

Defendant's arguments concerning geographical limitations are premature prior to discovery. Defendant argues that the complained of discriminatory conduct occurred without the United States and therefore some of Plaintiffs 'counts should be dismissed by the Court. Discovery will, as it suggests, discovery the location of residence of Defendant's agents and employees, where exactly Defendant's policies are generated, designed, ratified, and implemented. Contrary to Defendant's blanket assertions, courts have found that discriminatory conduct that occurs without the United States can fall within federal statutes. *See e.g., King v. Bd. of Control*, 221 F. Supp.2d 783 (E.D. Mich. 2002) (Title IX applied to conduct outside of the country during a study abroad program held by a university) and *Bird v. Lewis & Clark Coll.*, 104 F.Supp.2d 1271 (D. Or. 2000), *aff'd* 303 F.3d 1015 (9th Cir. 2002) (ADA applied to conduct abroad during a study abroad program).

Likewise, Defendant's suggestion that because there is no express private right of action pursuant to 22 U.S.C. §§2731 and 6412 (Anti-Semitism-Count III of Plaintiffs' Amended Complaint), that there is no basis for recovery is misleading and otherwise misplaced. The logical fallacy here is a mixture of strawman and the Texas sharpshooter in that defense counsel is cherry picking certain theories of recovery and reconstructing Plaintiffs' claims to suit its desired (and flawed) conclusion. The inquiry does not end at "there is no private right of action." Both state and federal courts have reasoned that:

> […] if a statute is designed to protect a class of persons, in which the plaintiff is included, from the type of harm which in fact occurred as a result of its violation, the issues of the defendant's duty

of care to the plaintiff and the defendant's breach of that duty are conclusively established upon proof that the statute was violate.

*German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1389 (S.D.N.Y. 1995);

> When a statute designed to protect a particular class of persons against a particular type of harm is invoked by a member of the protected class, a court may, in furtherance of the statutory purpose, interpret the statute as creating an additional standard of care . Violation of such a statutory standard, if unexcused, constitutes negligence per se so that the violating party must be found negligent if the violation is proved Negligence per se is not liability per se, however, because the protected class member still must establish that the statutory violation was the proximate cause of the occurrence.

*Dance v. Southampton*, 95 A.D.2d 442, 445-46 (N.Y. App. Div. 2d Dep't. 1983). And, thus, the statute enacted in response to attacks on Jewish people to monitor *and combat* anti-Semitism is without a doubt a statute "designed to protect a particular class of persons." Namely: it was enacted to protect Jewish people from discrimination like that alleged by Plaintiffs here. In fact as averred in the Amended Complaint the statute defines "violations" of "religious freedom." ECF No. 2, ¶58. To dismiss this Count III without proper briefing and bold and bald assertions made by Defendant would to do a further injustice to Plaintiffs and the potential class of Jewish people who are supposed to be protected by the Anti-Semitism statute.

Should Your Honor disagree or as the case develops through discovery and additional facts from class members, Plaintiffs' reserve their right to replead and file a Second Amended Complaint to encompass additional facts and concerns that the Court may have concerning Plaintiffs' allegations.

For all the reasons above, the Kleins and the undersigned respectfully request that this Court deny the Motion to Dismiss brought by Lufthansa in its July 29, 2022 Letter Brief.

Respectfully submitted,

*Scott C. Levenson*

Scott C. Levenson, Esq.
Levenson Law Group
Counsel for Plaintiffs

cc:      All Counsel of Record via ECF filing

⊕ Positive
As of: August 8, 2022 6:43 PM Z

## *German v. Fed. Home Loan Mortg. Corp.*

United States District Court for the Southern District of New York

August 21, 1995, Decided ; August 22, 1995, FILED

93 Civ. 6941 (RWS)

**Reporter**
896 F. Supp. 1385 *; 1995 U.S. Dist. LEXIS 12051 **

JENNIFER GERMAN and WELLINGTON GERMAN, infants by their Mother and Natural Guardian ANA MARTIZA GERMAN, and ANA MARTIZA GERMAN, Individually, Plaintiffs, - against - FEDERAL HOME LOAN MORTGAGE CORP., PROPERTY SERVICES COMPANY, CAISI MANAGEMENT COMPANY, INC., 1710 MONTGOMERY REALTY ASSOC., L.P., and JEROME DEUTSCH, Defendants.

## Core Terms

class certification, paint, intervene, moot, Plaintiffs', reargue, residing, Appeals, cases, funds, negligence per se, class action, severance, certification, housing, transitory, difference of opinion, named plaintiff, dwelling, parties, substantive grounds, relates back, administers, intervenors, landlord, certify, federal housing, motions, courts, hazard

## Case Summary

### Procedural Posture

Plaintiff residents filed suit against defendant mortgage company, realty group, and city alleging injury from exposure to lead paint in defendants' buildings. The United States District Court for the Southern District of New York found in favor of residents. Mortgage company and city filed a motion for reargument and realty associates filed a motion for clarification and to severe. Intervenor residents filed a motion to intervene.

### Overview

Court found that intervention was appropriate because the litigation was still in its early stages, so that intervenors' motion was timely. Additionally, the court held that there was no question that intervenors had potential claims with questions of law or fact in common with the residents. With respect to city's motion to reargue, court held that the facts established that city did administer funds to one of the tainted properties and

therefore reargument was not proper. Additionally, court held that mortgage company's motion to reargue was not appropriate because mortgage company's motion failed to establish controlling decisions or factual matters in support of their motion. Also, the court held that severing claims against realty group would neither serve the interest of justice nor further the prompt and efficient resolution of the litigation. Moreover, the court held that plaintiff's motion to reargue was proper from the purpose of clarification. With respect to the dismissal of plaintiff's negligence per se claim, court held that dismissal of that claim was proper because notwithstanding the statutory violation, defendants satisfied its duty of care.

### Outcome

Court held that residents' and intervenors' motions were granted and that defendants' motions were denied.

## LexisNexis® Headnotes

Civil
Procedure > Parties > Intervention > Permissive Intervention

Civil Procedure > Parties > Intervention > General Overview

*HN1*[↧] **Intervention, Permissive Intervention**

Fed. R. Civ. R. 24(b)(2) provides that upon timely application anyone may be permitted to intervene in an action when an applicant's claim or defense and the main action have a question of law or fact in common. *Rule 24(b)(2)* is to be construed liberally.

Case 1:22-cv-02957-BMC   Document 12   Filed 08/12/22   Page 7 of 30 PageID #: 62

Page 2 of 17

896 F. Supp. 1385, *1385; 1995 U.S. Dist. LEXIS 12051, **12051

Civil Procedure > Parties > Intervention > General Overview

**HN2**[↓] **Parties, Intervention**

*Fed. R. Civ. P. 24(b)(2)* is satisfied when, despite factual differences between the parties, a common question of law is involved. Ultimately, whether to allow a party to intervene is within the discretion of the district court.

Civil Procedure > Special Proceedings > Class Actions > General Overview

Civil Procedure > Parties > Intervention > General Overview

**HN3**[↓] **Special Proceedings, Class Actions**

When determining whether intervenor's create a new class of plaintiffs, there must be a showing that there is an absence of conflict and antagonistic interests between them and the class members, and second, that the plaintiffs' counsel is qualified, experienced and capable.

Civil Procedure > Judgments > Relief From Judgments

**HN4**[↓] **Judgments, Relief From Judgments**

Local Rule 3(j) provides in pertinent part: There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked. No oral argument shall be heard unless the court grants the motion and specially directs that the matter shall be reargued orally. No affidavits shall be filed by any party unless directed by the court. Thus, to be entitled to reargument under Local Rule 3(j), the moving party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion.

Civil Procedure > Judgments > Relief From Judgments > Motions to Reargue

Governments > Courts > Rule Application & Interpretation

Civil Procedure > Judgments > Relief From Judgments

**HN5**[↓] **Relief From Judgments, Motions to Reargue**

Local Rule 3(j) is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court. In deciding a Local Rule 3(j) motion, the court must not allow a party to use the motion to reargue as a substitute for appealing from a final judgment. As such, a party in its motion for reargument may not advance new facts, issues or arguments not previously presented to the court.

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

Civil Procedure > Special Proceedings > Class Actions > General Overview

**HN6**[↓] **Class Actions, Certification of Classes**

Under the appropriate circumstances, class certification may relate back to the filing of the complaint. One such circumstance is where the claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires. In such cases, the courts permit the class certification to relate back to the filing of the complaint and hold that the plaintiffs have properly preserved the merits of the case for judicial resolution.

Civil Procedure > Special Proceedings > Class Actions > Appellate Review

Civil Procedure > ... > Justiciability > Mootness > Evading Review Exception

Civil Procedure > Special Proceedings > Class Actions > General Overview

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

**HN7**[↓] **Class Actions, Appellate Review**

Even though a class had not yet been certified, the court holds that when the claims of the named plaintiffs became moot prior to class certification, the court need not decide whether the potential mootness of the claims of the named plaintiffs moots the entire case because, this is certainly the type of harm that is 'capable of repetition, yet evading review.'

> Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

> Civil Procedure > Special Proceedings > Class Actions > General Overview

**HN8[ ]  Class Actions, Certification of Classes**

The transitory exception does not require that the harm claimed by the plaintiff be capable of repetition as to the named plaintiff. It is sufficient that the controversy remains alive for members of the class in order for the class certification to relate back to the filing of the original complaint.

> Civil Procedure > Judgments > Relief From Judgments > Motions to Reargue

> Real Property Law > Financing > Secondary Mortgage Market > General Overview

> Civil Procedure > Judgments > Relief From Judgments

**HN9[ ]  Relief From Judgments, Motions to Reargue**

Local Rule 3(j) is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court. A Rule 3(j) motion is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved.

> Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

> Governments > Local Governments > Ordinances & Regulations

> Torts > ... > Proof > Violations of Law > General

Overview

**HN10[ ]  Relief From Judgments, Altering & Amending Judgments**

New York City Administrative Code, § 27-2013(h) provides: (1) The owner of a multiple dwelling shall remove or cover in a manner approved by the Department of Housing Preservation and Development any paint or other similar surface coating material having a reading of 0.7 milligrams of lead per square centimeter or greater or containing more than 0.5 of metallic lead based on the non-volatile content of the paint or other similar surface-coating material in the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in a multiple dwelling in which a child or children six (6) years of age and under reside.

> Governments > Local Governments > Ordinances & Regulations

**HN11[ ]  Local Governments, Ordinances & Regulations**

New York City Administrative Code, § 27-2013(h) provides: (2) In any multiple dwelling erected prior to January First, Nineteen Hundred Sixty in which paint or other similar surface-coating material is found to be peeling on the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age or under reside, it shall be presumed that the peeling substance contains more than 0.5 percent of metallic lead based on the nonvolatile content of the paint or other similar surface coating material or have a reading of 0.7 milligrams of lead per square centimeter or greater.

> Governments > Local Governments > Ordinances & Regulations

> Torts > ... > Proof > Violations of Law > General Overview

**HN12[ ]  Local Governments, Ordinances & Regulations**

New York City Administrative Code, § 27-2013(h) provides: (3) that the existence of paint or other similar surface-coating material having a reading of 0.7 milligrams of lead per square centimeter or containing

896 F. Supp. 1385, *1385; 1995 U.S. Dist. LEXIS 12051, **12051

more than 0.5 percent of metallic lead based on the non-volatile content of the paint or other similar surface-coating material on the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age and under reside shall constitute a class C immediately hazardous violation and subject the owner of such multiple dwelling unit to the penalties for such violation provided in article two of this subdivision. (4) Department of Housing Preservation and Development (DHPD) shall transmit to the Department of Health a list of violations (5) DHPD shall establish procedures for the enforcement of this subdivision.

Torts > Negligence

Torts > ... > Proof > Violations of Law > Statutes

### HN13[⬇] Torts, Negligence

Under the rule of negligence per se, if a statute is designed to protect a class of persons, in which the plaintiff is included, from the type of harm which in fact occurred as a result of its violation, the issues of the defendant's duty of care to the plaintiff and the defendant's breach of that duty are conclusively established upon proof that the statute was violated.

Governments > Local Governments > Ordinances & Regulations

Torts > ... > Elements > Causation > General Overview

Torts > Negligence

### HN14[⬇] Local Governments, Ordinances & Regulations

If violation of the New York City Administrative Code, including Section 27-2013(h) was the proximate cause of plaintiff's injury, then plaintiff may recover upon proof of the violation. If the violation had no direct bearing on the injury, however, proof of the violation is irrelevant.

Torts > ... > Duty > Standards of Care > General Overview

Torts > ... > Proof > Violations of Law > General

Overview

Torts > ... > Proof > Violations of Law > Statutes

### HN15[⬇] Duty, Standards of Care

Violation of a statute may be found to be merely evidence of negligence which the jury may consider along with the totality of the evidence. In such cases, the statute does not create a duty of care toward the plaintiff and the defendant's violation of the statute does not definitively establish a breach of duty to the plaintiff.

Torts > ... > Proof > Violations of Law > Statutes

Torts > ... > Proof > Violations of Law > General Overview

### HN16[⬇] Violations of Law, Statutes

The New York City Administrative Code has the force and effect of a statute in New York City. Violation of a statute, however, does not automatically constitute negligence per. Only statutes designed to protect a definite class of persons from a particular hazard, which persons within the class are incapable of avoiding, can give rise to negligence per se for violation of the statute.

Torts > ... > Proof > Violations of Law > Statutes

Torts > ... > Proof > Violations of Law > General Overview

### HN17[⬇] Violations of Law, Statutes

Although a statutory scheme intended for the protection of a particular class does not expressly provide for civil liability, a court may, in furtherance of the statutory purpose, impose negligence per se, or even strict liability, for a statutory violation. In order to warrant a finding of negligence per se for a statutory violation, the statute must evidence an intention, express or implied, that from disregard of its command a liability for resultant damages shall arise which would not exist but for the statute. Three factors are of central importance in this inquiry: (1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted, (2) whether a finding of negligence per se for violation of the statute would promote the legislative purpose, and (3) whether creation of such liability would be consistent

896 F. Supp. 1385, *1385; 1995 U.S. Dist. LEXIS 12051, **12051

with the legislative scheme.

Evidence > ... > Presumptions > Exceptions > Statutory Presumptions

Torts > ... > Proof > Violations of Law > General Overview

**HN18**[↓]  **Exceptions, Statutory Presumptions**

In plain and unambiguous language, New York City Administrative Code § 27-2013(h) puts the burden of identifying and removing lead paint hazards upon the landlord. The Code even creates a statutory presumption that peeling paint in older buildings has the prohibited level of lead content. The legislative intent to protect children under six, and the consequent obligations imposed upon landlords would be rendered meaningless if a landlord were not required to take action to remedy a lead condition in its building until it has received "notice" of the condition as the result of a confirmed test by others. Such a result would only encourage a landlord to remain "ignorant" and only obligate him to ameliorate such a condition upon notice. Such confirmation will usually come only after a child has already been poisoned.

Governments > Local Governments > Ordinances & Regulations

Torts > ... > Liabilities of Lessors > Negligence > General Overview

Torts > Premises & Property Liability > Lessees & Lessors > General Overview

**HN19**[↓]  **Local Governments, Ordinances & Regulations**

New York City Administrative Code § 27-2013(h) evinces a legislative intent to protect children under age six from the hazards of lead paint. Further, children residing in inner city apartments are a definable class who can be expected to act upon childish instincts and impulses in eating chips of paint. Landlords are in a far better position than tenants, particularly those tenants under six, to know whether or not peeling and crumbling paint in an apartment is likely to contain lead.

Torts > Negligence > Elements

Torts > ... > Proof > Violations of Law > General Overview

Torts > ... > Proof > Violations of Law > Statutes

**HN20**[↓]  **Negligence, Elements**

Under a negligence per se regime, the statute creates the duty and the violation establishes the breach. All that remains to be proved in a negligence action are causation and damages.

Civil Procedure > Appeals > Appellate Jurisdiction > Certified Questions

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

**HN21**[↓]  **Appellate Jurisdiction, Certified Questions**

In order for a court to certify a question pursuant to *28 U.S.C. § 1292(b)*, the ruling must: (1) involve a controlling question of law (2) as to which there are substantial grounds for difference of opinion, and (3) that an immediate appeal from the order may materially advance the ultimate termination of the litigation. *28 U.S.C.S. § 1292(b)*.

Civil Procedure > Appeals > Appellate Jurisdiction > Certified Questions

**HN22**[↓]  **Appellate Jurisdiction, Certified Questions**

Simply because a question of law has not been authoritatively addressed, however, does not make the question grounds for a substantial difference of opinion. Nor, for that matter, does the fact that the parties themselves disagree as to the interpretation of persuasive authority constitute a difference of opinion sufficient to warrant certification.

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

896 F. Supp. 1385, *1385; 1995 U.S. Dist. LEXIS 12051, **12051

Civil Procedure > Appeals > Appellate
Jurisdiction > Certified Questions

**_HN23_**[⬇️] **Class Actions, Certification of Classes**

Despite the liberal interpretation that the court must give
to _Fed. R. Civ. P. 23_, it may certify this as a class action
only after undertaking "rigorous analysis" to assure that
the requirements of the _Rule 23_ are satisfied.

Civil Procedure > Parties > Joinder of
Parties > Misjoinder

**_HN24_**[⬇️] **Joinder of Parties, Misjoinder**

_Fed. R. Civ. P. 21_ permits a court to add or drop parties
to an action when doing so would serve the ends of
justice and further the prompt and efficient disposition of
the litigation.

Civil Procedure > Parties > Joinder of
Parties > Misjoinder

Civil Procedure > Parties > Joinder of
Parties > General Overview

**_HN25_**[⬇️] **Joinder of Parties, Misjoinder**

_Fed. R. Civ. P. 21_ provides that misjoinder of parties is
not ground for dismissal of an action. Parties may be
dropped or added by order of the court on motion of any
party or of its own initiative at any stage of the action
and on such terms as are just. Any claim against a party
may be severed and proceeded with separately.

Civil Procedure > Trials > Separate Trials

**_HN26_**[⬇️] **Trials, Separate Trials**

The decision whether to sever a party or claim from an
action is within the broad discretion of the district court.
In deciding whether severance is appropriate, courts
generally consider (1) whether the issues sought to be
tried separately are significantly different from one
another, (2) whether the separable issues require the
testimony of different witnesses and different
documentary proof, (3) whether the party opposing the
severance will be prejudiced if it is granted and (4)
whether the party requesting the severance will be

prejudiced if it is not granted.

**Counsel:** **[**1]** Attorneys for Plaintiff, FITZGERALD &
FITZGERALD, P.C., 538 Riverdale Avenue, Yonkers,
NY 10705, By: JOHN M. DALY, ESQ., BRIAN J.
FARRELL, ESQ., JOHN E. FITZGERALD, ESQ., Of
Counsel and BRONX LEGAL SERVICES, 579
Courtlandt Avenue, Bronx, NY 10451, By: LUCY
BILLINGS, ESQ., MATTHEW J. CHACHERE, ESQ..

SIFF ROSEN, P.C., Attorney for Defendants Federal
Home Loan Mortgage Corporation and Caisi
Management Company, Inc. and Harold Beck d/b/a
Tebec Management Company, 233 Broadway, New
York, NY 10279, By: WILLIAM G. BALLAINE, ESQ.,
THOMAS G. MERRILL, ESQ., JOHN C. MORLAND,
ESQ., LANCE WOLF, ESQ., Of Counsel.

WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER, Attorney for New York City Housing Authority,
150 East 42nd Street, New York, NY 10017, By: PAUL
J. BOTTARI, ESQ., Of Counsel.

WEINSTEIN, CHAYT & CHASE, P.C., Attorney for
Defendants 1710 Montgomery Realty Assoc., P.C.,
Property Services Company, Wittenstein, Wagman and
Deutsch, 26 Court Street, Brooklyn, NY 11242, By:
IRWIN J. WEINSTEIN, ESQ., Of Counsel.

HON. PAUL A. CROTTY, Corporation Counsel of the
City of New York, Attorney for Defendant City of New
York, 100 Church Street, New York, NY 10007, By:
GABRIEL TAUSSIG, ESQ., **[**2]** STEVEN LEVI,
ESQ., LISA S.J. YEE, ESQ., Of Counsel.

**Judges:** ROBERT W. SWEET, U.S.D.J.

**Opinion by:** ROBERT W. SWEET

# Opinion

**[*1389]** _OPINION_

**Sweet, D.J.**

Defendant Federal Home Loan Mortgage Corporation
("Freddie Mac") has moved for reargument of a portion
of the May 8, 1995 opinion of this action (the "Opinion"),
or in the alternative, for leave to appeal two issues to
the Court of Appeals pursuant to _28 USC § 1292(b)_.
Defendants 1710 Montgomery Realty Associates, L.P.
("1710") and partners Todd Wittenstein ("Wittenstein"),
Alex Wagman ("Wagman"), and Jerome Deutsch

Case 1:22-cv-02957-BMC   Document 12   Filed 08/12/22   Page 12 of 30 PageID #: 67

Page 7 of 17

896 F. Supp. 1385, *1389; 1995 U.S. Dist. LEXIS 12051, **2

("Deutsch") (collectively the "1710 Defendants") have moved for clarification of the Opinion and to sever the action against them. Defendant the City of New York (the "City") has moved for reargument, or in the alternative to appeal, pursuant to *28 U.S.C. 1292(b)*, the issue of its liability, pursuant to *42 U.S.C. § 1983*, under the Community Development Block Grant ("CDBG") program and the Lead Paint Poisoning Prevention Act (the "LPPPA"). Plaintiffs have moved to reargue the dismissal of their negligence *per se* claims. Hector Luis David, Marilyn Bernardez and Florentina David move to intervene as class plaintiffs.

For the **[**3]** reasons set forth below, Defendants Freddie Mac and New York City's motions are denied, the 1710 Defendants' motion is denied and Plaintiffs' motion to reargue, is granted and the motion to intervene is granted.

### The Parties

The parties, facts and prior proceeding are fully described in earlier opinions of this court, familiarity with which is assumed. *See German v. Federal Home Loan Mortgage Corp., 1994 U.S. Dist. LEXIS 8716, 1994 WL 319154* (S.D.N.Y. June 28, 1994) *(German I); German v. Federal Home Loan Mortgage Corp., 885 F. Supp. 537 (S.D.N.Y. 1995) (German II* or the "Opinion").  **[*1390]** A review of those facts and prior proceedings relevant to this motion is presented below.

Freddie Mac allegedly was the owner of the Montgomery Building from December 1988 until October 31, 1991, and from May 8, 1992, until September 16, 1992.

The City owned and operated the Montgomery Building from October 31, 1991, until May 8, 1992. In addition, the City receives and administers federal funds to operate buildings under section 8 (*42 U.S.C. § 1437f*) and the Community Development Block Grant ("CDBG") program (*42 U.S.C. § 5301*). The complaint alleges that the City, as a Public Housing Authority ("PHA"),  **[**4]** used federal funds in the German home to repair and rehabilitate as part of a Community Development Block Grant program.

Defendant 1710 Montgomery Realty Associates, L.P. ("1710") and partners Todd Wittenstein ("Wittenstein"), Alex Wagman ("Wagman"), and Jerome Deutsch ("Deutsch") allegedly have owned the Montgomery Building from September 16, 1992, until the present. 1710 has its principal office in Valley Stream, New York. Wittenstein and Deutsch reside in the City of New York.

Wagman resides in Valley Stream, New York.

Defendant Freddie Mac allegedly owned the St. Nicholas Building until September 1, 1994.

NYCHA receives and administers Section 8 funds to property throughout New York City.

### The Proposed Intervenors

Proposed intervening plaintiff Hector Luis David ("Hector Luis") was born on August 17, 1989, and has resided at 1670 Boston Road, Apartment 21-C, Bronx, New York (the "Boston Road building") since birth. He was diagnosed as lead poisoned on November 9, 1992.

Proposed intervening plaintiff Marilyn Bernardez ("Marilyn") was born on October 20, 1980, and has resided at the Boston Road building since January 16, 1984. Marilyn is currently 6 months pregnant.  **[**5]** She was diagnosed in 1984 and in March of 1995 as lead poisoned.

Proposed intervening plaintiff Florentina David is the mother and natural guardian of plaintiffs Hector Luis and Marilyn. She has lived at the Boston Road building since January 1984 and brings this suit on behalf of herself, her children and Marilyn's fetus.

According to the Intervening Complaint, the Boston Road building is owned and operated by the City of New York. The City receives and uses federal Community Development Block Grant Funds for this property.

### Facts and Prior Proceedings

This case was originally transferred to federal court from the State Court in New York on October 5, 1993.

Pursuant to a Summons with Notice and Verified Complaint dated July 26, 1993, the Germans instituted an action in Supreme Court, Bronx County, against PSC, CAISI, 1710, Freddie Mac, Deutsch, Wittenstein, and Wagman. The complaint sought damages for personal injuries to the infant Germans and sought relief for Ana German in her individual capacity as mother and natural guardian of the infant plaintiffs.

Pursuant to *28 U.S.C. § 1446(b)*, Freddie Mac, as an entity created by federal legislation, removed this action **[**6]** to this Court on October 5, 1993.

Argument was heard on a motion to amend the complaint on May 11, 1994. An opinion on that motion was issued on June 28, 1994, granting the plaintiffs'

Case 1:22-cv-02957-BMC   Document 12   Filed 08/12/22   Page 13 of 30 PageID #: 68

Page 8 of 17

896 F. Supp. 1385, *1390; 1995 U.S. Dist. LEXIS 12051, **6

right to amend their complaint to include additional defendants and to supplement their claims. *See German v. Federal Home Mortgage Corporation, 1994 U.S. Dist. LEXIS 8716, 1994 WL 319154* (S.D.N.Y.).

On August 17, 1994, this Court denied the Goffin plaintiffs' request for an order blocking the sale of the building, (Proceedings, Aug. 17, 1994, at 20), and on August 22, 1994 the Goffins filed an intervening complaint in this action which sought individual and class relief.

As of September 1, 1994 Freddie Mac had sold the St. Nicholas Avenue property. As of November 1994, none of the defendants owned the building.

A Second Amended Complaint (the "Complaint") was filed on September 14, 1994 in **[*1391]** which the plaintiffs sought class certification and an order requiring defendants to take steps necessary to protect their tenants from lead poisoning.

On September 29, 1994 the Germans and the Goffins filed a motion asking for class certification. Motions to dismiss and for partial summary judgment were also filed by all the defendants **[**7]** in September. Argument was heard on the motions on November 22, 1995.

On May 8, 1995 the Opinion was filed which resolved motions submitted by all parties. In sum, it granted in a modified form plaintiffs' motion to certify a class, granted defendants' motions to dismiss state claims based on theories of negligence *per se,* strict product liability, and liability for ultrahazardous substances. Defendants' motions to dismiss the other state causes of action were denied.

The plaintiffs requested certification for the following class and subclasses:

Class Warning and Notice
All persons residing on premises either owned, managed, or operated by any of the defendants or where they administer assistance payments under a federal housing program.
Sub-Class #1: Medical Monitoring
All persons age 8 years and under and all women of child-bearing age (12-50 years old) residing in buildings owned, managed, or operated by defendants or where they administer assistance payments under a federal housing program.
Sub-Class #2: Abatement

All persons age 8 years and under and all women

of child-bearing age (12-50 years old) residing in buildings owned, managed, or **[**8]** operated by defendants or where they administer assistance payments under a federal housing program, and where there is lead-based paint in or on the dwelling or common area.

By opinion dated May 8, 1995, the Court granted the class certification motion, in a somewhat modified form. Specifically, the Court held that:

The classes certified will include "children under seven years old residing in buildings owned, managed, or operated by defendants or where they administer assistance payments under a federal housing program." While the Court agrees that as a practical matter, notice of the risks and signs of lead paint problems will need to be sent to all tenants to insure that those at risk of injury are notified, the class can only contain those at risk. The sub-class for Medical Monitoring will include the modification that there must be the risk of lead-based paint, consistent with the statutes, including the statutory presumptions. The remainder of the class definitions requested by plaintiffs will remain as requested by plaintiffs and as described herein.

*German II, at 561*.

In the final analysis, the class was certified as against the City as a PHA under **[**9]** the claims brought by the German plaintiffs and Freddie Mac as an owner and NYCHA as the PHA under the claims brought by the Goffin plaintiffs.

A motion to intervene the Franklin family as plaintiffs was filed on June 27, 1995 and has been pending *sub judice* since August 4, 1995 when the final papers were filed on the motion.

### *Discussion*

### I. *The Davids' Motion to Intervene will be Granted*

### A. *Legal Standard*

The Intervenors presently before this Court seek to intervene pursuant to *Rule 24(b)(2), Fed. R. Civ. P.* **HN1**[⬆] The Rule provides that "upon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common." The Rule is to be construed liberally, *see Davis v. Smith, 431 F. Supp. 1206, 1209 (S.D.N.Y. 1977),* aff'd, *607 F.2d 535 (2d Cir. 1978),* and it does not require an identity of

Case 1:22-cv-02957-BMC   Document 12   Filed 08/12/22   Page 14 of 30 PageID #: 69

Page 9 of 17

896 F. Supp. 1385, *1391; 1995 U.S. Dist. LEXIS 12051, **9

facts, *see* Swift v. Toia, 450 F. Supp. 983, 990 (S.D.N.Y. 1978), Swift v. Blum, 598 F.2d 312 (2d Cir. 1979), *cert. denied*, 444 U.S. 1025, 100 S. Ct. 687, 62 L. Ed. 2d 658 (1980).

[*1392] HN2[↑] Rule 24(b)(2) is satisfied when, "despite factual differences between [**10] the parties, a common question of law is involved." *Davis, 431 F. Supp. at 1209*; *see* Brooks v. Flagg Brothers, Inc., 63 F.R.D. 409, 412-14 (S.D.N.Y. 1974). Ultimately, whether to allow a party to intervene is within the discretion of the district court. *See* United States Postal Service v. Brennan, 579 F.2d 188, 191 (2d Cir. 1978); Cook v. Pan American World Airways, Inc., 636 F. Supp. 693, 698 (S.D.N.Y. 1986).

Varying facts and circumstances may actually add to the Court's understanding of the scope and breadth of the claims and therefore support an intervention motion. Rivera v. New York City Housing Authority, 1995 U.S. Dist. LEXIS 8617, 1995 WL 375912 (S.D.N.Y. 1995) at *3 (citing McNeill v. New York City Housing Authority, 719 F. Supp. 233, 250 (S.D.N.Y. 1989); Hurley v. Van Lare, 365 F. Supp. 186, 196 (S.D.N.Y. 1973), *rev'd on other grounds and remanded*, 497 F.2d 1208 (2d Cir. 1974)). Admitting intervenors who add no new issues "merely clutters the [class] action unnecessarily."

This litigation is still is in its early stages, so that the Intervenors' motion is timely. There is no question that the intervenors have potential claims with questions of law or fact in common [**11] with the presently named Plaintiffs. As a family with children under seven that live in a unit that receives CDBG money administered by the City, they are appropriate class members and will provide the Court with additional material to review as this case progresses. The additional Plaintiffs will not detract from the original Plaintiffs' case and will add to the Court's understanding of the facts. *See Rivera*, 1995 WL 375912 at *3. In addition, since the litigation involves housing that often changes ownership, and may involve a relatively fluid plaintiff class, it may well assist the litigation to have additional named plaintiffs.

Finally, intervention is appropriate here where the intervenors are represented by the same counsel as the other named plaintiffs and their participation will facilitate adjudication of the dispute. *See Rivera, id.;* Davis v. Smith, 431 F. Supp. 1206, 1209 (S.D.N.Y. 1977).

The intervenors do not create a new class of plaintiffs. There is no Rule 23 motion before the Court at this time

and the Court will therefore not consider the potential class defining implications of the Davids' intervention. Additionally, the plaintiffs have not moved for the [**12] Davids to be class representatives, nor provided the court with the required showing that they are appropriate. In particular, HN3[↑] there must be a showing that there is an absence of conflict and antagonistic interests between them and the class members, and second, that the plaintiffs' counsel is "qualified, experienced and capable." Ross v. A.H. Robins Co., 100 F.R.D. 5, 7 (S.D.N.Y. 1982); *accord* In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992), *cert. dismissed*, 113 S. Ct. 1070 (1993). Defendants must be given an opportunity to provide the Court any arguments they may have on the suitability of the Davids as class representatives.

## II. *Motions to Reargue*

## *Standard for Considering Motions to Reargue*

HN4[↑] Local Rule 3(j) provides in pertinent part: There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked. No oral argument shall be heard unless the court grants the motion and specially directs that the matter shall be reargued orally. No affidavits shall be filed by any party unless directed by the court. Thus, to be entitled [**13] to reargument under Local Rule 3(j), the moving party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion. *See* Ameritrust Co. Nat'l Ass'n v. Dew, 151 F.R.D. 237 (S.D.N.Y. 1993); Fulani v. Brady, 149 F.R.D. 501, 503 (S.D.N.Y. 1993), *aff'd* 35 F.3d 49 (2d Cir. 1994); East Coast Novelty Co. v. City of New York, 141 F.R.D. 245, 245 (S.D.N.Y. 1992); *B.N.E. Swedbank, S.A. v. Banker, 791 F. Supp. 1002, 1008 (S.D.N.Y. 1992)*; Novak v. National Broadcasting Co., 760 F. Supp. 47, 48 [*1393] (S.D.N.Y. 1991); Ashley Meadows Farm Inc. v. American Horse Shows Ass'n, 624 F. Supp. 856, 857 (S.D.N.Y. 1985).

HN5[↑] Local Rule 3(j) is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court. *See* Caleb & Co. v. E.I. Du Pont De Nemours & Co., 624 F. Supp. 747, 748 (S.D.N.Y. 1985). In deciding a Local Rule 3(j) motion, the court must not allow a party to use the motion to reargue as a substitute for appealing from a final judgment. *See* Morser, 715 F. Supp. 516 at 517;

Case 1:22-cv-02957-BMC   Document 12   Filed 08/12/22   Page 15 of 30 PageID #: 70

Page 10 of 17

896 F. Supp. 1385, *1393; 1995 U.S. Dist. LEXIS 12051, **13

*Korwek v. Hunt, 649 F. Supp. 1547, 1548 (S.D.N.Y. 1986),* **[\*\*14]** *aff'd 827 F.2d 874 (2d Cir. 1987).* As such, a party in its motion for reargument "may not advance new facts, issues or arguments not previously presented to the court." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc., 1989 U.S. Dist. LEXIS 9145, No. 86 Civ. 6447, 1989 WL 162315,* at \* 3 (S.D.N.Y. Aug. 4, 1989).

### A. *The City's Motion to Reargue is Denied*

The City argues that the Court overlooked the fact that the City did not administer CDBG funds to the German unit at the time the class action was filed, and that, in fact, the City ceased to administer said funds on May 8, 1992. If this is true, then the German's did not have standing to sue the City as a PHA for injunctive relief at the time the complaint was filed.

Paragraph 120 of the Second Amended Complaint states that "Defendant City, through HPD, used CDBG funds in the housing of plaintiffs Jennifer, Wellington and Ana Maritza German." The Court assumed at the time of the May Opinion, and the plaintiffs contend in their opposition papers to this motion, that the City through HPD still administers funds to the Montgomery Avenue property. If the facts can be established to the contrary, a motion for relief may well be appropriate, **[\*\*15]** and leave is granted for that purpose.

### B. *Freddie Mac's motion to Reargue is Denied*

In the Opinion, the Court noted that after filing their intervening class complaint, Freddie Mac sold the St. Nicholas Building inhabited by the Goffins. The Court noted that the courts have adopted a "flexible" approach to the mootness doctrine in class actions, particularly where an "inherently transient" exception applies, and where class claims would not be heard due to the relatively short duration of the complained of actions compared to the somewhat lengthy times involved in the litigation process. The May Opinion addressed this issue, in part, as follows:

> The Court of Appeals has noted that the application of these various mootness doctrines depends in part on whether the court is presented with a class action because, in general, if the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot. *Board of School Commissioners of Indianapolis v. Jacobs, 420 U.S. 128, 129-30, 95 S. Ct. 848, 849-50, 43 L. Ed. 2d 74 (1975)* (per curiam). In contrast, class certification will preserve an otherwise moot claim.

*McLaughlin, 500 U.S. 44 at 51-52, 114 L. Ed. 2d 49, 111 S. Ct. 1661.* **[\*\*16]** "In class actions ? courts have come to recognize that an individual plaintiff may continue to represent the interests of others even after any prospect of individual recovery has vanished." 13A Charles A. Wright, et al., Federal Practice and Procedure § 3533.9 (1984 & Supp. 1994); *see also Gerstein, 420 U.S. 103 at 110 n. 11, 95 S. Ct. 854 at 861 n. 11, 43 L. Ed. 2d 54.*

*HN6*[⬆] Under the appropriate circumstances, class certification may relate back to the filing of the complaint. *Comer, 37 F.3d 775 at 800* (citing *McLaughlin, 500 U.S. 44 at 52, 111 S. Ct. 1661 at 1667, 114 L. Ed. 2d 49; Sosna, 419 U.S. 393 at 402, n. 11, 95 S. Ct. 553 at 559, n. 11, 42 L. Ed. 2d 532.* One such circumstance is where the claims are "'so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'" *McLaughlin, 500 U.S. 44 at 52, 111 S. Ct. at 1667* (quoting *Geraghty,* 445 U.S. 388 at 399, 100 S. Ct. at 1210); *Gerstein, [\*1394] 420 U.S. 103 at 110 n. 11, 95 S. Ct. 854 at 861 n. 11, 43 L. Ed. 2d 54* (class action challenging state practice of holding for trial without probable cause hearing; named class representatives convicted prior to Supreme Court review; not moot because **[\*\*17]** the nature of pretrial detention is such that "it was most unlikely" that the courts would determine the constitutional challenge prior to conviction or release; furthermore, the case was capable of repetition); *Comer, 37 F.3d 775 at 800.* In such cases, the courts permit the class certification to relate back to the filing of the complaint and hold that the plaintiffs have properly preserved the merits of the case for judicial resolution. *Swisher v. Brady, 438 U.S. 204 at 213 n.11, 98 S. Ct. 2699 at 2705 n.11, 57 L. Ed. 2d 705 (1978); Sosna, 419 U.S. 393 at 402 n.11, 95 S. Ct. 553 at 559 n.11, 42 L. Ed. 2d 532.*

In *Comer, HN7*[⬆] even though a class had not yet been certified, the Court of Appeals held that when the claims of the named plaintiffs became moot prior to class certification, "we need not decide whether the potential mootness of the claims of the named plaintiffs moots the entire case because, as we stated above, this is certainly the type of harm that is 'capable of repetition, yet evading review.'" *citing Sosna, 419 U.S. at 399-400, 95 S. Ct. at 557-*

Case 1:22-cv-02957-BMC   Document 12   Filed 08/12/22   Page 16 of 30 PageID #: 71

Page 11 of 17

896 F. Supp. 1385, *1394; 1995 U.S. Dist. LEXIS 12051, **17

58. Comer, 37 F.3d 775 at 800. In *Comer* minority residents brought a class action on behalf of city public housing project residents and applicants for federal housing **[**18]** assistance alleging violations of the Fair Housing Act. In determining that the claims related back to the date of the original filing, the Court of Appeals stated in the circumstances of that case, "in particular, the transitory nature of the public housing market …." the case would relate back to the original filing.

In this case, the Goffins' original complaint was filed on August 22, 1994. The complaint asked for class certification and for class action equitable relief. At the time that the complaint was filed the claims against Freddie Mac were not moot. The Court finds that the same issues of a transitory population exist in these circumstances. In addition, we have seen in the short life of this case how frequently ownership of buildings turns over. Applying the "capable of evading review" exception to this case, and following the direction established in *Comer,* the class certification relates back to the original filing and Freddie Mac is an appropriate defendant for the plaintiff class that the Goff ins seek to represent.

Freddie Mac argues that the duration of the ownership of Freddie Mac properties is not such that the inherently transitory exception should apply **[**19]** and that even if relation back is appropriate in this case, it was only appropriate to relate back to the time when the motion for class certification was filed, not when the class complaint was filed. The former was filed on September 29, 1994 and the latter on August 22, 1994.

The Opinion held that the inherently transitory exception was met on these facts. This was based on the frequency with which the buildings changed ownership. Freddie Mac often owns buildings for relatively short periods of time. In the case of the Germans, Freddie Mac owned the building for approximately four months in 1992 and for less than three years between 1988 and 1991. In the case of the Goffins, Freddie Mac was selling the unit five months after the Goffins moved in. In an affidavit submitted in support of the Goffins original motion to intervene, the Court was provided with 11 examples of properties in which Freddie Mac took and transferred title on the same day and several others where title was transferred in less than two months. This information led the court to conclude that the ownership of these properties changes frequently.

Courts in this Circuit have applied the inherently transitory exception **[**20]** to persons waiting on lists for federal housing, Comer v. Cisneros, 37 F.3d 775 (2d Cir. 1994) (plaintiffs waiting on lists for public housing, some for years), who have applied for public benefits, Robidoux v. Celani, 987 F.2d 931, 938-39 (2d Cir. 1993) (all waiting in excess of 30 days); Brown v. Giuliani, 158 F.R.D. 251, 265 (E.D.N.Y. 1994) (named plaintiffs waited between 51 days and more than a year to have their applications for review of AFDC benefit **[*1395]** requests), to prisoners in long term custody, Clarkson v. Coughlin, 783 F. Supp. 789, 794-95 (S.D.N.Y. 1994) (prisoner incarcerated for more than three years was released prior to class certification).

In each of these cases the Court's certification was "deemed to relate back to the filing of the complaint in order to avoid mooting the entire controversy," Ribidoux, 987 F.2d at 939; see also Comer, 37 F.3d at 799; Brown v. Giuliani, 158 F.R.D. at 265; Clarkson v. Coughlin, 783 F. Supp. at 795, not to any subsequently filed motion for certification. In *Comer,* the complaint was filed "less than two months prior to the filing of the motion for class certification," 37 F.3d at 797 and the court **[**21]** held that the certification related back to the original filing. Similar time frames are present in this case where the intervening complaint was filed approximately 5 weeks prior to the filing of a motion for class certification.

HN8[↑] ] The transitory exception does not require that the harm claimed by the plaintiff be capable of repetition as to the named plaintiff. It is sufficient that the controversy remains alive for members of the class in order for the class certification to relate back to the filing of the original complaint. Jane B. v. New York City Department of Social Services, 117 F.R.D. 64, 68 (S.D.N.Y. 1987).

Freddie Mac argues that the District Court's almost three year delay in deciding the class certification motion was what compelled the Court of Appeals in *Comer* to apply relation back to avoid mootness [1]. However, the Court of Appeals also cited the transitory nature of the population. Relation back to the time of the filing of the complaint is standard in class action cases involving the transitory exception. *See Comer, Ribidoux, Brown* and *Clarkson.*

**[**22]** Freddie Mac has not presented the Court

---

[1] Freddie Mac offers several other means to distinguish *Comer.* As the Court did not rely on those issues in formulating its decision, it need not distinguish them here.

Case 1:22-cv-02957-BMC   Document 12   Filed 08/12/22   Page 17 of 30 PageID #: 72

Page 12 of 17

896 F. Supp. 1385, *1395; 1995 U.S. Dist. LEXIS 12051, **22

controlling decisions or factual matters that were put before the Court on the underlying motion and not considered. The motion is denied as it pertains to the mootness question.

The Opinion held that the Germans lack standing to seek injunctive relief from Freddie Mac since Freddie Mac did not own the Montgomery building at the time that the initial complaint was filed. *See German II, 885 F. Supp. at 551*.

Finally, the motion to reargue the appropriateness of class certification is also denied. Freddie Mac has not cited any cases or facts which the Court overlooked in reaching its decision in May. Instead, Freddie Mac reiterates in an abbreviated form many of its earlier arguments. **HN9**[⬆] Local Rule 3(j) is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court. *See Caleb & Co. v. E.I. Du Pont De Nemours & Co., 624 F. Supp. 747, 748 (S.D.N.Y. 1985)*. A Rule 3(j) motion is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved. *See Morser, 715 F. Supp. 516 at 517; Korwek v. Hunt, 649 F. [**23] Supp. 1547, 1548 (S.D.N.Y. 1986)*. The motion is denied as to this issue as well.

### C. *Plaintiffs' Motion to Reargue is Granted for the Purpose of Clarification and the Decision to Dismiss the Negligence Per Se Claims is Affirmed after Review*

Plaintiffs have moved this Court, pursuant to *Federal Rule of Civil Procedure 59(e)* and Rule 3(j) of the Civil Rules of this Court, to amend the portion of the Opinion that dismissed Plaintiffs' negligence *per se* claims. At issue are various provisions of the **HN10**[⬆] New York City Administrative Code (the "Code"), including Section 27-2013(h) thereof ("§ 27-2013(h)"), which provides:

(1) The owner of a multiple dwelling shall remove or cover in a manner approved by the [Department of Housing Preservation and Development ("DHPD")] any paint or other similar surface coating material having a reading of 0.7 milligrams of lead per square centimeter or greater or containing more than 0.5 of metallic lead based on the non-volatile content of the paint or other similar surface-coating material in the interior **[*1396]** walls, ceilings, doors, window sills or moldings in any dwelling unit in a multiple dwelling in which a child or children six (6) **[**24]** years of age and under reside;

**HN11**[⬆] (2) In any multiple dwelling erected prior to January First, Nineteen Hundred Sixty in which paint or other similar surface-coating material is found to be peeling on the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age or under reside, it shall be presumed that the peeling substance contains more than 0.5 percent of metallic lead based on the nonvolatile content of the paint or other similar surface coating material or have a reading of 0.7 milligrams of lead per square centimeter or greater.

(3) **HN12**[⬆] The existence of paint or other similar surface-coating material having a reading of 0.7 milligrams of lead per square centimeter or containing more than 0.5 percent of metallic lead based on the non-volatile content of the paint or other similar surface-coating material on the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age and under reside shall constitute a class C immediately hazardous violation and subject the owner of such multiple dwelling unit to the penalties for such violation provided **[**25]** in article two of this subdivision. . . .

(4) DHPD shall transmit to the Department of Health a list of violations.

(5) DHPD shall establish procedures for the enforcement of this subdivision.

Title 27, Chapter 2 -- Housing and Maintenance Code, § 27-1013(h).

In particular, the parties dispute whether a violation of § 27-2013(h) constitutes negligence *per se,* or is merely evidence of negligence. Because the parties' motion papers, as well as many of the cases cited therein, reveal that this distinction is clouded by no small amount of confusion, some clarification is warranted.

**HN13**[⬆] Under the rule of negligence *per se,* if a statute is designed to protect a class of persons, in which the plaintiff is included, from the type of harm which in fact occurred as a result of its violation, the issues of the defendant's duty of care to the plaintiff and the defendant's breach of that duty are conclusively established upon proof that the statute was violated. *See Prosser and Keeton on Torts,* pg. 229-30, 5th Ed. 1984; *see also Martin v. Herzog, 228 N.Y. 164, 126 N.E. 814 (1920)*.

Although the effect of the rule is to stamp the defendant's conduct as "negligence," **[**26]** the causal

Case 1:22-cv-02957-BMC  Document 12  Filed 08/12/22  Page 18 of 30 PageID #: 73

Page 13 of 17

896 F. Supp. 1385, *1396; 1995 U.S. Dist. LEXIS 12051, **26

relation between the violation and the harm to the plaintiff remains to be established. *HN14*[↑] If violation of the statute was the proximate cause of the plaintiff's injury, then the plaintiff may recover upon proof of the violation. If the violation had no direct bearing on the injury, however, proof of the violation is irrelevant. *Brown v. Shyne, 242 N.Y. 176, 180, 151 N.E. 197 (1926)*.

Alternatively, *HN15*[↑] violation of a statute may be found to be merely evidence of negligence which the jury may consider along with the totality of the evidence. In such cases, the statute does not create a duty of care toward the plaintiff and the defendant's violation of the statute does not definitively establish a breach of duty to the plaintiff.

As discussed in the May Opinion, the New York Court of Appeals has indicated that *HN16*[↑] the Code has the force and effect of a statute in New York City. *See Guzman v. Haven Plaza Hous. Dev. Fund Co., 69 N.Y.2d 559, 565 n.3, 509 N.E.2d 51, 52, 516 N.Y.S.2d 451, 452 (1987)*; *see also Juarez v. Wavecrest Mgmt. Team, 212 A.D.2d 38, 627 N.Y.S.2d 620, 1995 N.Y. App. Div. LEXIS 5808*, *11 (1st Dep't May 30, 1995). Violation of a statute, however, does not automatically [**27] constitute negligence *per se*. *See Gain v. Eastern Reinforcing Service, Inc., 193 A.D.2d 255, 603 N.Y.S.2d 189, 191* (3d Dep't 1993). Only statutes designed to protect a definite class of persons from a particular hazard, which persons within the class are incapable of avoiding, can give rise to negligence *per se* for violation of the statute. *Van Gaasbeck v. Wetabuck Central Sch. Dist. No. 1 of Amenia, 21 N.Y.2d 239, 244, 234 N.E.2d 243, 245, 287 N.Y.S.2d 77, 80 (1967)*.

[*1397] *HN17*[↑] Although a statutory scheme intended for the protection of a particular class does not expressly provide for civil liability, a court may, in furtherance of the statutory purpose, impose negligence *per se*, or even strict liability, for a statutory violation. *See Trimarco v. Klein, 56 N.Y.2d 98, 107, 436 N.E.2d 502, 506, 451 N.Y.S.2d 52, 56 (1982)*. In order to warrant a finding of negligence *per se* for a statutory violation, the statute must evidence "an intention, express or implied, that from disregard of [its] command a liability for resultant damages shall arise 'which would not exist but for the statute.'" *Gain v. Eastern Reinforcing Serv., 193 A.D.2d 255, 603 N.Y.S.2d 189, 191* (3d Dep't [**28] 1993), *quoting Shepard v. Zachary P. Taylor Publ. Co., 234 N.Y. 465, 468, 138 N.E. 409 (1923)*. Three factors are of central importance in this

inquiry: (1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted, (2) whether a finding of negligence *per se* for violation of the statute would promote the legislative purpose, and (3) whether creation of such liability would be consistent with the legislative scheme. *See Id.*

In characterizing § 27-2013(h), the Appellate Division recently noted,

*HN18*[↑] In plain and unambiguous language, [§ 27-2013(h)] puts the burden of identifying and removing lead paint hazards upon the landlord. The Code even creates a statutory presumption that peeling paint in older buildings has the prohibited level of lead content. The legislative intent to protect children under six, and the consequent obligations imposed upon landlords would be rendered meaningless if a landlord were not required to take action to remedy a lead condition in its building until it has received "notice" of the condition as the result of a confirmed test by others. Such a result would only encourage a landlord to remain "ignorant [**29] and only obligate him to ameliorate such a condition upon notice. . . . Such confirmation will usually come only after a child has already been poisoned.

*Juarez v. Wavecrest Mgmt. Team, 212 A.D.2d 38, 627 N.Y.S.2d 620, 1995 N.Y. App. Div. LEXIS 5808*, *17-18 (1st Dep't May 30, 1995).

The *Juarez* Court concludes that *HN19*[↑] § 27-2013(h) evinces a legislative intent to protect children under age six from the hazards of lead paint. Further, "children residing in inner city apartments are a definable class who can be expected to act upon childish instincts and impulses in eating chips of paint. Landlords are in a far better position than tenants, particularly those tenants under six, to know whether or not peeling and crumbling paint in an apartment is likely to contain lead." *Id. at *13*.

While stating that a violation of § 27-2013(h) is negligence *per se* the *Juarez* Court goes on to say, however, that "the application of this standard [negligence per se], rather than that of absolute liability, imposes on the landlord a standard of reasonableness. The landlord may, unlike the case with absolute liability, persuade the fact finder that the existence of a lead paint hazard existed [**30] despite his diligent and reasonable efforts to prevent it." *Juarez,* 1995 N.Y. App. Div. LEXIS at *19-20.

The opportunity to avoid liability by showing that,

Case 1:22-cv-02957-BMC  Document 12  Filed 08/12/22  Page 19 of 30 PageID #: 74

Page 14 of 17

896 F. Supp. 1385, *1397; 1995 U.S. Dist. LEXIS 12051, **30

notwithstanding a violation of statute, reasonable efforts were made to remedy the lead paint hazard would appear to be foreclosed under a regime of negligence *per se*. HN20[⬆] Under a negligence *per se* regime, the statute creates the duty and the violation establishes the breach. All that remains to be proved in a negligence action are causation and damages. The Appellate Division's contrary indication in *Juarez* suggests that it viewed the violation of § 27-2013(h) merely as evidence of negligence, which may be rebutted by a showing that, notwithstanding the statutory violation, the defendant satisfied its duty of care by taking reasonable precautions for the plaintiff's safety.

Thus, following *Juarez,* the Court finds that violations of § 27-2013(h) is evidence of negligence.

The motion to reargue is granted, for the purpose of further clarification, but the motion to dismiss stands for the reasons stated above and in the Opinion.

**[*1398] III. *Motions to Certify***

***Standards for Reviewing Request to Certify* HN21[⬆]**

**[**31]** In order for Freddie Mac or the City to bring an issue to the Court of Appeals at this time, this Court must certify, pursuant to *28 U.S.C. § 1292(b)*, that rulings within the May 8 Opinion: (1) involve a controlling question of law (2) as to which there are substantial grounds for difference of opinion, and (3) that an immediate appeal from the order may materially advance the ultimate termination of the litigation. *28 U.S.C. § 1292(b); see also Klinghoffer v. S.N.C. Achille Lauro Ed Altri- Gestione Motonave Achille Lauro In Amministrazione Straordinaria, 921 F.2d 21, 23 (2d Cir. 1990).*

The Second Circuit has repeatedly "urged the district courts to exercise great care in making a *§ 1292(b)* certification." *Westwood Pharmaceuticals, Inc. v. National Fuel Gas Dist. Corp., 964 F.2d 85, 89 (2d Cir. 1992).* Certification is limited to extraordinary cases where appellate review might avoid protracted and expensive litigation. It is not intended as a vehicle to provide early review of difficult rulings in hard cases. *Sadowski v. Technical Career Insts., Inc., 1995 U.S. Dist. LEXIS 3184, *7; Abortion Rights Mobilization, Inc. v. Regan, 552 F. Supp. 364, 366 (S.D.N.Y. [**32] 1982).*

This standard is not met here. While there is no doubt that a ruling on appeal in favor of the City or Freddie

Mac would reduce the discovery each would be required to produce, it would not end the litigation as to either of them, nor would it substantially reduce the unresolved issues in this case, as there are numerous claims and other defendants who would be unaffected by a favorable ruling on these issues. As described below, in the motion to sever the individual defendants, the Court would likely be reluctant to sever the non-class defendants at this time since the named plaintiffs' claims involve all of the defendants and overlapping issues of law and fact.

Regardless, however, of the effect that a successful appeal might have, the test for certifying an issue is a three part test. Each prong must be satisfied. Even assuming that the Second Circuit's answer would control the outcome and advance the termination of this litigation, there are not "substantial grounds for difference of opinion" as to this Court's resolution of the mootness question in the case of Freddie Mac or of the right of the plaintiffs to sue the City under the federal statutes.

**A. *The City's* [**33] *Motion is Denied***

There is no reason to certify the question of whether or not the Germans have standing to sue the City in its capacity as a PHA. This is an issue which will be resolved once the factual question is resolved. It cannot be resolved until there is evidence on the question of whether or not the City administered CDGB funds to the Montgomery Avenue building at the time the complaint was filed.

As to the question of whether or not the LPPPA or CDBG gives rise to a cause of action under *42 U.S.C. § 1983*, the parties agree that the precise question at issue in this case has not yet been directly addressed by either the Supreme Court or the Second Circuit. HN22[⬆] Simply because a question of law has not been authoritatively addressed, however, does not make the question grounds for a substantial difference of opinion. *Hubbell v. Pass & Seymour,* 883 F. supp. 955, *1995 WL 464906* at *2; *Chamarac Properties, Inc. v. Pike, 1994 U.S. Dist. LEXIS 10748, 1994 WL 410902*, *2 (S.D.N.Y. 1994); *American Tel. & Tel. Co. v. North American Industries, Inc., 783 F. Supp. 810, 814 (S.D.N.Y. 1992).* Nor, for that matter, does the fact that the parties themselves disagree as to the interpretation of persuasive authority constitute **[**34]** a "difference of opinion" sufficient to warrant certification. *See Hubbell v. Pass & Seymour,* at *2.

In *Chan v. City of New York, 1 F.3d 96, 102-106* (2d

896 F. Supp. 1385, *1398; 1995 U.S. Dist. LEXIS 12051, **34

Cir.), *cert. denied*, 126 L. Ed. 2d 423, 114 S. Ct. 472 (1993), a case decided after the Supreme Court decided *Suter v. Artist M., 503 U.S. 347, 118 L. Ed. 2d 1, 112 S. Ct. 1360 (1992)*, the Court of Appeals articulated a test for determining whether or not a federal statute created an enforceable right under *§ 1983*. The Court [*1399] of Appeals applied the Supreme Court test in *Wilder v. Virginia Hospital Ass'n., 496 U.S. 498, 110 L. Ed. 2d 455, 110 S. Ct. 2510 (1990)*, "or to the extent that it differs) the *Suter* analysis…" Following the procedures mandated in *Chan*, the May Opinion found a cause of action against the City as a PHA.

The City does not believe that the Opinion is correct although it describes the question as "a difficult and close one." The City has not shown that there is substantial ground for differences of opinion. In fact there is no opinion other than this one on this exact question of whether a PHA can be sued for violations of the LPPPA by a person living in housing that receives CDBG funds. [**35] On the other hand, there is no "substantial ground for difference of opinion" as to the methodology that should be used to determine whether or not a particular statute confers a right to sue pursuant to *§ 1983*. *Chan* described the standard and this Court applied it.

Finding no substantial ground for a difference of opinion, the use of interlocutory appeal would be inappropriate in this instance and the motion, is therefore denied.

### 3. *Freddie Mac's Motion to Certify is Denied*

Freddie Mac has moved to certify two issues to the Court of Appeals: 1) whether the fact that the Goffins' injunctive claims against Freddie Mac were moot prior to the filing of the class certification motion makes them improper class representatives and 2) whether plaintiffs met their burden of establishing the prerequisites of *Rule 23* and are entitled to proceed against Freddie Mac in this action.

As discussed above, in the motion to reargue section, the original ruling on mootness does present the sort of controversial ruling that requires interlocutory review. Freddie Mac has not presented substantial grounds for difference of opinion, and for this reason as well as those described above, [**36] the motion will be denied.

While the Third Circuit held in *Lusardi v. Xerox Corp.,*

*975 F.2d 964 (3rd Cir. 1992)* [2] that the class representative's claim must be live at the time that the motion to certify is filed, the Second Circuit has rendered no such decision and has reaffirmed twice in the last few years and since the *Lusardi* decision that in class actions the relation back can be to the filing of the complaint. [3] [**37] *See* *Comer v. Cisneros, 37 F.3d 775 (2d Cir. 1994)*; *Robidoux v. Celani, 987 F.2d 931, 938-39 (2d Cir. 1993)*. Because there is no difference of opinion among controlling cases in this Circuit and, as discussed above, this would only resolve one piece of this litigation, the motion as to this question, is denied. [4]

The motion to certify the class certification is also denied. The Second Circuit has directed district courts to apply *Rule 23* according to a liberal rather than a restrictive interpretation, *see* *Korn v. Franchard Corp., 456 F.2d 1206, 1208-09 (2d Cir. 1972)*; *Green v. Wolf Corp., 406 F.2d 291, 298, 301 (2d Cir. 1968)*, *cert. denied, 395 U.S. 977, 23 L. Ed. 2d 766, 89 S. Ct. 2131 (1969)*, and has explicitly noted its preference for class certification in suits involving public housing because of the fluid composition of the public housing population. *See* *Comer v. Cisneros, 37 F.3d 775, 797 (2d Cir. 1994)*.

However, *HN23*[⬆] despite the liberal interpretation that this Court must give to *Rule 23*, it may certify this as a class action only after undertaking "rigorous analysis" to assure [*1400] that the requirements of the Rule are satisfied. *General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, [**38] 161, 72 L. Ed. 2d 740, 102 S. Ct. 2364*

_____

[2] While the Court also ruled that the facts of the *Lusardi* case did not invoke the transitory exception, thus rendering its holding in such a case advisory, the statement of the Third Circuit's pronouncement is strong enough that it is not appropriate to argue this distinction.

[3] The line of cases that allows relation back to the time that the complaint was filed recognizes that at some point the named plaintiffs' claim is moot, but allows the case to proceed so as to avoid mooting the entire controversy. In this case the Goffins' interest and ability to litigate the claims on behalf of the class was not significantly different on August 31, 1994 than it was shortly thereafter on September 29 when the class certification motion was filed. Furthermore, the claim was not moot when the briefing schedule for the motion was established by the Court at a conference on August 24, 1994.

[4] In addition, the proposed intervention of plaintiffs living in Freddie Mac housing may moot this issue, while it concededly would not cure any lack of jurisdiction of the original class plaintiffs.

Case 1:22-cv-02957-BMC   Document 12   Filed 08/12/22   Page 21 of 30 PageID #: 76

Page 16 of 17

896 F. Supp. 1385, *1400; 1995 U.S. Dist. LEXIS 12051, **38

*(1982)*.

The Court conducted a rigorous and lengthy review of the *Rule 23* requirements for class certification and held in its May Opinion that certification was proper. It is the role of the District Court to determine what is manageable. Freddie Mac presented no basis for substantial grounds for differences of opinion, except by reciting the same cases it argued supported denial of certification in the first instance. Those cases were considered fully in the May Opinion and did not mandate a different outcome then. For this reason, and those described above, certification of the decision to certify the class would be improper.

Under the Opinion, three classes were certified: one of children less than seven years living in housing owned by Freddie Mac, a second of same living in housing to which the City administers CDBG funds and the third of same to which NYCHA administers Section 8 funds. Each of these three classes has subclasses that were defined by plaintiffs.

### IV. *The Claims Against the 1710 Defendants will Not Be Severed*

The 1710 Defendants have moved the Court to sever the German Plaintiffs' claims against them from the Plaintiffs' **[**39]** claims against the other defendants pursuant to *Federal Rule of Civil Procedure 21* [5]. **HN24**[⬆] *Rule 21* permits a court to add or drop parties to an action when doing so would serve the ends of justice and further the prompt and efficient disposition of the litigation. [6] *E.I. Du Pont de Nemours & Co. v. Fine Arts*

---

[5] **HN25**[⬆] *Federal Rule of Civil Procedure 21* provides:

Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

[6] Although the 1710 Defendants cite *Fed. R. Civ. P. 21* as the source of this Court's authority to sever the German Plaintiffs' claims against them, the Court also has authority pursuant to *Fed. R. Civ. P. 42(b)* to order separate trials of a plaintiff's claims when doing so will be expeditious and serve the interests of judicial economy. *Fed. R. Civ. P. 42(b)*. Technically, *Rule 21* deals with severance of parties, while *Rule 42(b)* deals with separation of trials. The distinction is that separate trials result in one judgment unless the Court orders otherwise pursuant to *Fed. R. Civ. P. 54(b)*, whereas

*Reproduction Co., 1995 U.S. Dist. LEXIS 7040*, * 4-5 (S.D.N.Y. May 22, 1995); *Levine v. Federal Deposit Ins. Corp., 136 F.R.D. 544, 550 (1991)*.

**[**40]** **HN26**[⬆]

The decision whether to sever a party or claim from an action is within the broad discretion of the district court. *Id., quoting New York v. Hendrickson Bros., Inc., 840 F.2d 1065* (2d Cir.), *cert. denied, 488 U.S. 848, 102 L. Ed. 2d 101, 109 S. Ct. 128 (1988)*; 7 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1689 (1988). In deciding whether severance is appropriate, courts generally consider (1) whether the issues sought to be tried separately are significantly different from one another, (2) whether the separable issues require the testimony of different witnesses and different documentary proof, (3) whether the party opposing the severance will be prejudiced if it is granted and (4) whether the party requesting the severance will be prejudiced if it is not granted. *See Hal Leonard Publ. Corp. v. Future Generations, Inc., 1994 U.S. Dist. LEXIS 5195*, * 4-5 (S.D.N.Y. April 22, 1994), citing cases.

At this point, severing the Plaintiffs' claims against the 1710 Defendants would neither serve the interests of justice nor further the prompt and efficient resolution of this litigation. There are numerous questions of law and fact common to the German Plaintiffs' **[**41]** claims against the 1710 Defendants and against the other defendants. For example, at any trial in this matter the German Plaintiffs will be required to prove, *inter* **[*1401]** *alia,* that their apartment was painted with a paint having a lead content greater than the maximum allowable under § 27-2013(h), that the children who ingested the paint were under the age of seven, that the injuries suffered by the German children were caused by their ingestion of the lead paint, that the Germans were not warned of the presence of the lead paint, at what level of lead is there harm, and other elements of the state law claims.

Proof of many of these points as they pertain to the 1710 Defendants likely will in significant part require the testimony of the same witnesses and presentation of the same evidence as will be required in proving them against the other defendants. To require the German

---

severance results in two judgments. The same considerations are implicated, however, under either rule, namely, the convenience of the parties, avoidance of prejudice to either party, and promotion of the expeditious resolution of the litigation. *See Sutton Hill Assocs. v. Landes, 1988 U.S. Dist. LEXIS 4746*, *4-5 (S.D.N.Y. May 24, 1988).

896 F. Supp. 1385, *1401; 1995 U.S. Dist. LEXIS 12051, **41

Plaintiffs to prove these points at separate trials, one against the 1710 Defendants, and another against the City, Freddie Mac, Caisi and Tebec as prior owners and managers of the same building, would be repetitious, prolong the ultimate termination of this litigation, and place an unnecessary burden on the **[**42]** German Plaintiffs. In addition, severance of the claims against the 1710 Defendants would pose a significant danger of inconsistent judgments in the separate actions.

Balanced against these concerns, the danger that the 1710 Defendants will be prejudiced by having the German Plaintiffs' claims against them litigated in the same action as the claims against the other defendants is relatively insubstantial. Moreover, whatever minimal degree of prejudice might inhere in a joint trial can be eliminated by careful instructions to the jury.

For the foregoing reasons, the 1710 Defendants' motion for severance will be denied.

### *Conclusion*

For the reasons stated above, Defendants' motions are denied, Plaintiffs' motion to reargue is granted and the motion to intervene is granted.

It is so ordered.

**New York, N. Y.**

**August 21, 1995**


**ROBERT W. SWEET**

**U.S.D.J.**

---

**End of Document**

⚠️ Caution
As of: August 8, 2022 6:43 PM Z

# *Dance v. Southampton*

Supreme Court of New York, Appellate Division, Second Department

September 26, 1983

No Number in Original

**Reporter**

95 A.D.2d 442 *; 467 N.Y.S.2d 203 **; 1983 N.Y. App. Div. LEXIS 19637 ***

Samuel Dance et al., Appellants, v. Town of Southampton, Respondent

**Prior History: [***1]** Appeal from a judgment of the Supreme Court in favor of defendant, entered July 15, 1981 in Suffolk County, upon a verdict rendered at a Trial Term (Guy A. Graves, J.).

**Disposition:** Judgment of the Supreme Court, Suffolk County, entered July 15, 1981, reversed, on the law and in the interests of justice, and new trial granted, with costs to abide the event.

## Core Terms

drive, licensing statute, license, motor vehicle, police car, reporting, drivers, miles per hour, plaintiffs', Turnpike, speed, statutory standard, standard of care, courtroom, sections, arrest, negligence per se doctrine, negligence action, negligence per se, southbound lane, cross-examination, subdivision, violators, warrants, impeach, Cases

## Case Summary

**Procedural Posture**
Plaintiff driver appealed from a judgment of the Supreme Court of Suffolk County (New York), which found that defendant town was free from fault in a negligence action that involved a town police car which struck driver's vehicle from behind, which left driver a quadriplegic.

**Overview**
Driver's car was struck from behind by town's police car, which left driver a quadriplegic. Driver had failed to report an alleged knee condition or disability to the Commissioner of Motor Vehicles prior to the accident. Driver filed a negligence action against town. The speed and manner in which the police car had been driven and

whether driver had stopped at a yield sign were the principal issues at trial. A jury found town free of fault. The court held that the trial court erred in invoking the doctrine of negligence per se with respect to driver's asserted violation of the disability reporting sections of the vehicle traffic law. It was error to charge that violation of the reporting sections was negligence per se, because driver had not been examined by the commissioner and no determination was ever made that he was incompetent to drive or that he needed special devices to do so.

**Outcome**
The judgment of the trial court was reversed and a new trial granted.

## LexisNexis® Headnotes

Torts > ... > Duty > Standards of Care > General Overview

Torts > ... > Proof > Violations of Law > General Overview

Torts > ... > Proof > Violations of Law > Standards of Care

Torts > ... > Proof > Violations of Law > Statutes

Torts > ... > Standards of Care > Reasonable Care > General Overview

Torts > ... > Standards of Care > Reasonable Care > Reasonable Person

*HN1*[⬇] **Duty, Standards of Care**

Under common law, a person is negligent when he fails

95 A.D.2d 442, *442; 467 N.Y.S.2d 203, **203; 1983 N.Y. App. Div. LEXIS 19637, ***1

to exercise that degree of care which a reasonably prudent person would have exercised under the same circumstances. When a statute designed to protect a particular class of persons against a particular type of harm is invoked by a member of the protected class, a court may, in furtherance of the statutory purpose, interpret the statute as creating an additional standard of care. Violation of such a statutory standard, if unexcused, constitutes negligence per se so that the violating party must be found negligent if the violation is proved. Negligence per se is not liability per se, however, because the protected class member still must establish that the statutory violation was the proximate cause of the occurrence.

Torts > ... > Proof > Violations of Law > Standards of Care

Torts > ... > Proof > Violations of Law > General Overview

*HN2*[↓]  **Violations of Law, Standards of Care**

The terms of a regulatory statute should not receive automatic construction as a standard of care in negligence litigation, for judgment should be exercised as to the appropriateness of the statute for that purpose.

Governments > State & Territorial Governments > Licenses

Torts > ... > Proof > Violations of Law > General Overview

*HN3*[↓]  **State & Territorial Governments, Licenses**

Almost universally, licensing statutes are not regarded as creating a duty to individual highway travelers or pedestrians. New York's view comports with the general one, for it rejects violation of motor vehicle licensing statutes as negligence.

Torts > ... > Causation > Proximate Cause > General Overview

Torts > ... > Proof > Violations of Law > General Overview

Torts > ... > Proof > Violations of Law > Statutes

*HN4*[↓]  **Causation, Proximate Cause**

Causation is subsumed under statutory purpose analysis. The strength of the logical connection between violation of the statute and injury is an appropriate concern in deciding whether the statutory purpose will be furthered by invocation of the doctrine of negligence per se.

Governments > State & Territorial Governments > Licenses

Torts > ... > Proof > Violations of Law > Standards of Care

Torts > ... > Proof > Violations of Law > General Overview

*HN5*[↓]  **State & Territorial Governments, Licenses**

The reporting statutes are constituents of the state's licensing scheme and the court believes that they create no standard of care bearing on negligence.

Torts > ... > Proof > Violations of Law > Statutes

Torts > ... > Proof > Violations of Law > General Overview

*HN6*[↓]  **Violations of Law, Statutes**

While the reporting statutes permit licensing authorities to identify incompetent drivers without waiting for the normal license renewal date and thus ultimately reduce highway accidents, to automatically derive a conclusion of negligence from violation of such statutes would present considerable potential for unfairness and overpunishment.

Torts > ... > Proof > Violations of Law > General Overview

*HN7*[↓]  **Proof, Violations of Law**

The violation of a restriction placed on a license after an examination and administrative determination may be admissible on the question of negligence.

Criminal Law &
Procedure > Trials > Witnesses > Impeachment

Evidence > ... > Impeachment > Convictions &
Other Criminal Process > General Overview

*HN8*[⬇] **Witnesses, Impeachment**

Under *N.Y. C.P.L.R. 4513*, conviction of a crime and the underlying facts of the criminal acts may be used to impeach the credibility of a witness at a civil trial. Impeachment based on an arrest or indictment alone is improper, however, since they involve mere accusations of guilt.

Evidence > ... > Testimony > Examination > General Overview

*HN9*[⬇] **Testimony, Examination**

While a cross-examiner may not inquire concerning an indictment or arrest, there may be good-faith inquiry concerning a specific immoral, vicious or criminal act, if there is a reasonable factual basis for it.

## Headnotes/Summary

### Headnotes

### Motor Vehicles -- Violation of Disability Reporting Statutes

In an action for personal injuries sustained as the result of an automobile accident in which it was shown that plaintiff had had, prior to the collision, several surgical procedures performed on his right knee, it was error to invoke the doctrine of negligence per se in connection with subdivision 4 of *section 506* and *subdivision 9* of *section 509 of the Vehicle and Traffic Law*, which provide, respectively, that a licensed driver must give notice of disability to the Commissioner of Motor Vehicles and may not operate any vehicle until such notice has been given, since the statutes do not create a duty of care for the benefit of individual motorists; the complete exoneration of defendant by the jury indicates that the erroneous charge influenced the verdict and, accordingly, **[***2]** reversal and a new trial are mandated.  Furthermore, an important witness for plaintiff was improperly cross-examined in that he was subjected to repeated questioning concerning arrest warrants and criminal charges, even though conviction

of a crime or underlying immoral conduct was not shown, and this violation of the rules applicable to impeachment was clearly prejudicial; the method by which the witness was impeached was an error grave enough to have affected the verdict and to warrant consideration of the negligence per se charge error, which, although was not preserved for appeal, itself warrants reversal.

**Counsel:** *Kelly & Jiras* and *David Jaroslawicz (Robert Kelly* of counsel), for appellants.

*Mulholland, Minion, Roe & Clifford (Michael Majewski* and *Joseph D.  Ahearn* of counsel), for respondent.

**Judges:** Lazer, J.  Damiani, J.P., Mangano and Thompson, JJ., concur.

**Opinion by:** LAZER

## Opinion

**[*442]** OPINION OF THE COURT

**[**204]**  At the completion of a trial on the issue of liability in this negligence action against the Town of Southampton, the jury found the town free of fault and judgment was entered in the town's favor.  We conclude that the gravity of certain trial **[***3]** errors and the interests of justice compel reversal and a new trial.

**[*443]** I

On October 7, 1979, plaintiff Samuel Dance drove his Ford Pinto southerly on a road that intersected Bridgehampton Turnpike at a narrow angle. Immediately after the Pinto entered the southbound lane of the Bridgehampton Turnpike it was struck from behind by a Town of Southampton police car and the consequence to Dance was quadriplegia.  Among the principal issues at the trial were the speed and manner in which the police car had been driven and whether Dance had stopped at a yield sign before entering the southbound lane of **[**205]** Bridgehampton Turnpike, which is a two-lane highway.

Dance testified that he stopped at the yield sign before entering the turnpike and that the police car did not come into his view until he was fully in the southbound lane of traffic.  On cross-examination he admitted that prior to the collision several surgical procedures had

95 A.D.2d 442, *443; 467 N.Y.S.2d 203, **205; 1983 N.Y. App. Div. LEXIS 19637, ***3

been performed on his right knee, but he insisted that his ability to drive was unaffected. This contention was supported by Dance's orthopedist who testified that his patient's ability to drive was unimpaired by the knee injury. The town's **[***4]** orthopedist was of a contrary view, declaring that the range of motion of Dance's knee would have been substantially restricted, that leg movements between pedals would have caused pain, and that the ability to apply braking force would have been sharply diminished. The fact that Dance had not reported his condition to the Commissioner of Motor Vehicles became a major focus of the town's defense.

Dance's case was buttressed by the testimony of Roy Surprise who claimed to have been driving south on Bridgehampton Turnpike just prior to the accident when he saw a southbound police car pass a station wagon in a nonpassing zone. Upon the approach of a northbound vehicle, the police car -- proceeding at about 65 miles per hour -- made a hasty return to the southbound lane which Dance had just entered and the collision ensued. Surprise stopped at the accident scene but did not report his story until about a year after the occurrence. The driver of the station wagon testified that the police car passed her at least a half mile before the scene of the accident. Another witness, whose home was adjacent to the turnpike, testified **[*444]** that he saw Dance stop at the yield sign "for **[***5]** maybe a second or two" before entering the turnpike.

The driver of the police car, Officer William Beyer, presented yet another version of the incident when he told the court that Dance had entered the highway without stopping at the yield sign and then decreased the speed of his car until it almost came to a halt. Beyer claimed that his own speed was only 50 miles per hour, and that he had slammed on his brakes as soon as he saw Dance's car but was unable to avoid the collision.

The accident reconstruction experts were in partial conflict. Plaintiffs' engineer concluded that the police car had been traveling at 62 miles per hour before it started braking and that its speed at impact was 35 miles per hour, while Dance's was about 25 miles per hour. Defendant's expert agreed with the conclusion as to the impact speeds, but contended that the police car's speed before braking was between 49 and 55.4 miles per hour. It was his belief that Dance had not stopped at the yield sign because a Pinto could not have reached the point of impact at a speed of 25 miles per hour if it had stopped. The other evidence in the case was subject to conflicting inferences.

The jury determined that **[***6]** the town had not been negligent.

II

On appeal, plaintiffs argue that the trial court committed reversible error when, in dealing with Dance's failure to report his knee condition to the Commissioner of Motor Vehicles, it charged the jury that a violation of subdivision 4 of *section 506 of the Vehicle and Traffic Law* was negligence per se for which Dance was to be held liable if the violation was the proximate cause of the accident. Subdivision 4 -- which was read to the jury -- provides that: "Any person holding a license issued pursuant to this chapter who suffers permanent loss of use of one or both hands or arms or of one or both feet or legs, or one eye shall, before operating any motor vehicle or motorcycle make report thereof to the commissioner, who shall take such reasonable action as may be proper under the provisions of this section."

**[*445]** The court also charged that a violation of subdivision 9 of *section 509 of the Vehicle and Traffic Law* would constitute negligence. That subdivision provides that **[**206]** "[whenever] notice of disability is required to be given to the commissioner as required by this article, no person shall operate any motor vehicle unless **[***7]** such notice has been given." During its deliberations, the jury requested that both sections of the Vehicle and Traffic Law be repeated. Having failed to except to these charges at the trial, plaintiffs now assert that subdivision 4 of *section 506* applies solely to the total loss of use of a limb and not a partial loss as was the case with Dance's leg. Whether a partial loss must be reported to the commissioner if it substantially affects a person's ability to drive (see, also, *Vehicle and Traffic Law, § 404-a*, *subd 3*) is an issue we need not reach, for we conclude that the sections charged do not create a statutory duty of care for the benefit of individual motorists. Therefore, it was error for the trial court to invoke the doctrine of negligence per se in connection with either section.

**HN1**[⬆] Under common law, a person is negligent when he fails to exercise that degree of care which a reasonably prudent person would have exercised under the same circumstances. When a statute designed to protect a particular class of persons against a particular type of harm is invoked by a member of the protected class, a court may, in furtherance of the statutory purpose, interpret the statute **[***8]** as creating an additional standard of care (see *Trimarco v KLein, 56 NY2d 98, 108*; *Martin v Herzog, 228 NY 164, 168*;

95 A.D.2d 442, *445; 467 N.Y.S.2d 203, **206; 1983 N.Y. App. Div. LEXIS 19637, ***8

*Restatement, Torts 2d, § 286*; 1 NY PJI2d, pp 152-153). Violation of such a statutory standard, if unexcused, constitutes negligence per se so that the violating party must be found negligent if the violation is proved (see, generally, 2 Harper and James, Law of Torts, § 17.6; Thayer, Public Wrong and Private Action, 27 Harv L Rev 317; Lowndes, Civil Liability Created by Criminal Legislation, *16 Minn L Rev 361*; Morris, The Role of Criminal Statutes in Negligence Actions, 49 Col L Rev 21; James, Statutory Standards and Negligence in Accident Cases, 11 La L Rev 95). Negligence per se is not liability per se, however, because the protected class member still must establish that the statutory violation was the proximate cause of the occurrence **[*446]** (see *Martin v Herzog, supra*; Prosser, Contributory Negligence as Defense to Violation of Statute, 32 Minn L Rev 105, 111).

Whether a statutory requirement creates a standard of care is frequently a matter of judicial construction (see Morris, The Relation of Criminal Statutes to Tort Liability, 46 Harv L **[***9]** Rev 453). Where a regulatory statute contains no reference to a civil remedy for its violation, the method most frequently used by the judiciary to justify recognition of a standard of care is to discern an implied or presumed legislative intent to create such a standard. A more satisfactory explanation for judicial recognition of such a standard, however, is furtherance of the statute's underlying policy for the protection of certain individuals (see Prosser, Torts [4th ed], p 191; 2 Harper and James, Law of Torts, § 17.6, pp 994-995). Where the statute codifies an already existing common-law rule or where the conduct prohibited is closely related to common-law negligence, a violation of the statute is often regarded as negligence per se (Prosser, Contributory Negligence as Defense to Violation of Statute, 32 Minn L Rev 105, 109-110). But where the statutory requirement constitutes a departure from common-law standards, the doctrine of negligence per se should be applied flexibly rather than rigidly, for rigid application may impose liability upon violators who are free from fault in any real sense and the result may be substantial civil damages totally disproportionate to the **[***10]** relatively small penalty prescribed by statute (James, Statutory Standards and Negligence in Accident Cases, 11 La L Rev 95, 108; Morris, The Relation of Criminal Statutes to Tort Liability, 46 Harv L Rev 453, 458). Thus, *HN2*[↑] the terms of a regulatory statute should not receive automatic construction as a standard of care in negligence litigation, for judgment should be exercised as to the appropriateness of the statute for that purpose (James, Statutory Standards and Negligence in Accident Cases, *op. cit.*, p 119).

**[**207]** A prime illustration of flexibility of application is to be found in the judicial attitude toward vehicular licensing statutes. *HN3*[↑] Almost universally, licensing statutes are not regarded as creating a duty to individual highway travelers or pedestrians (see Prosser, Torts [4th ed], p 193; **[*447]** Gregory, Breach of Criminal Licensing Statutes in Civil Litigation, 36 Cornell L Q 622; Note, The Effect of Penal Statutes on Civil Liability, 32 Col L Rev 712, 719; Note, Negligence -- Violation of Statute or Ordinance as Negligence or Evidence of Negligence -- Rules in Minnesota, 19 Minn L Rev 666, 672; 5A Warren, Negligence in the New York Courts, Automobiles, **[***11]** § 1.05; 7A Am Jur 2d, Automobiles and Highway Traffic, §§ 427-430; Ann., *29 ALR2d 963*). New York's view comports with the general one, for it rejects violation of motor vehicle licensing statutes as negligence (see *Hanley v Albano, 20 AD2d 644*; *Phass v MacClenathen, 274 App Div 535*; *Clarke v Doolittle, 205 App Div 697*; *Messersmith v American Fid. Co., 187 App Div 35*, affd *232 NY 161*; *Hyde v McCreery, 145 App Div 729*).

The most persuasive of the various explanations for the rejectionist attitude is the fact that licensing statutes do not establish standards of care under which drivers must perform certain acts in relation to other drivers in any prescribed fashion (Gregory, Breach of Criminal Licensing Statutes in Civil Litigation, 36 Cornell L Q 622, 632; Morris, The Relation of Criminal Statutes to Tort Liability, 46 Harv L Rev 453, 458). In contrast to sections of the Vehicle and Traffic Law that are clearly intended to set statutory standards of conduct (see, e.g., tit VII [rules of the road]; art 9 [equipment]), licensing statutes do not specify the standard or correct method of using or equipping a motor vehicle. The rejection of licensing statutes as **[***12]** standards of care emanates from reasoned policy judgments which recognize that while unlicensed drivers may be incompetent in particular cases, the possibility of exceptions is significant enough to justify a case-by-case determination of negligence without the automatic imposition of negligence under the negligence per se doctrine (Komesar, In Search of a General Approach to Legal Analysis: A Comparative Institutional Alternative, 79 Mich L Rev 1350, 1380). In addition, it is often stated that a violation, such as driving without a license, is not the proximate cause of the injury (see, e.g., *Hanley v Albano, 20 AD2d 644*, *supra*; *Hyde v McCreery, 145 App Div 729*, *supra*). While this latter approach has been criticized as misleading **[*448]** since causation is normally for the trier of fact and consideration of the causation issue begs the question as to whether a duty exists (see James, Statutory Standards and Negligence

in Accident Cases, 11 La L Rev 95, 121), we conclude that **HN4[↑]** causation is subsumed under statutory purpose analysis. The strength of the logical connection between violation of the statute and injury is an appropriate concern in deciding whether the statutory **[***13]** purpose will be furthered by invocation of the doctrine of negligence per se (see Gregory, Breach of Criminal Licensing Statutes in Civil Litigation, 36 Cornell L Q 622, 635).

We turn, then, to the basis for our conclusion that the trial court erred in invoking the doctrine of negligence per se with respect to Dance's asserted violation of the disability reporting sections of the Vehicle and Traffic Law. The reporting requirements, originally enacted as an amendment to section 20 of the Vehicle and Traffic Law of 1929 (see L 1948, ch 257), were more recently recodified in a new article 19 of the Vehicle and Traffic Law entitled "Licensing of Drivers" (L 1972, ch 780; Memorandum of State Department of Motor Vehicles, NY Legis Ann, 1972, pp 282-284). Since civil liability goes unmentioned in these sections or their legislative history, and since the statutes involve an area not directly covered by common-law standards, justification for adoption of their requirements as standards of care depends on considerations of sound policy (see Morris, The Role of Criminal Statutes in Negligence Actions, 49 Col L Rev 21, 22).

**[**208]** **HN5[↑]**] The reporting statutes are constituents of the State's **[***14]** licensing scheme and we believe that they create no standard of care bearing on negligence. Under the reporting statutes, the licensee is required to give notice of disability to the Commissioner of Motor Vehicles and may not operate any vehicle until such notice has been given (*Vehicle and Traffic Law, § 509*, *subd 9*). However, in the absence of any determination by the commissioner relating to the licensee's competency to drive, violation of the reporting requirement is an omission that falls in the same class as failure to obtain a license before driving. Neither the reporting statute nor the statute that requires a driver to obtain a license before driving specifies the correct method **[*449]** of operating or equipping the vehicle, so that there is in fact no standard of care to adopt for negligence actions (Gregory, Breach of Criminal Licensing Statutes in Civil Litigation, 36 Cornell L Q 622). The usual reasoned policy considerations support our conclusion. While under some circumstances a person who breaches the reporting mandate may be wholly or partially incompetent to drive, we cannot ignore the strong possibility that such a violator actually may exercise due care **[***15]** and drive properly in a

particular situation (Komesar, In Search of a General Approach to Legal Analysis: A Comparative Institutional Alternative, 79 Mich L Rev 1350, 1380). Should the reporting requirements become standards of care in negligence actions, juries would be required to find violators negligent without considering any particular violator's actual operation of the vehicle or his or her physical ability to drive when the accident occurred. **HN6[↑]**] While the reporting statutes permit licensing authorities to identify incompetent drivers without waiting for the normal license renewal date and thus ultimately reduce highway accidents (see Governor's bill jacket, L 1948, ch 257), to automatically derive a conclusion of negligence from violation of such statutes would present considerable potential for unfairness and overpunishment.

It is true, of course, that **HN7[↑]**] the violation of a restriction placed on a license after an examination and administrative determination may be admissible on the question of negligence (see *Martin v Alabama 84 Truck Rental*, 38 AD2d 577), but Dance was not examined by the commissioner and no determination was ever made that he was incompetent to drive or **[***16]** that he needed special devices to do so. Manifestly, it was error for the trial court to charge that violation of the reporting sections was negligence per se.

Since we have reached and decided the merits of the charge issue despite plaintiffs' failure to preserve it for appeal, it is incumbent that we explain why we have done so. We view the interests of justice as requiring that we reach the issue because the case was a close one (see *Carroll v Harris, 23 AD2d 582*), the negligence per se instructions were prejudicial (see *Hartley v Szadkowski, 32 AD2d 550*) and the circumstances of the trial, including **[*450]** other preserved error, made it quite likely that the erroneous charge affected the jury's determination. The jury found the town entirely free of negligence even though Dance's car was fully in the southbound lane when it was struck from behind with severe impact. The complete exoneration of the town is a significant indication that the erroneous charge influenced the verdict, particularly since the erroneous charge was given twice and since the alleged violation of the reporting statute was referred to in summation as well. The error mandates reversal and **[***17]** a new trial ( *DiGrazia v Castronova, 48 AD2d 249, 251*; *Zeleznik v Jewish Chronic Disease Hosp., 47 AD2d 199, 207*; Memoranda of Judicial Conference, NY Legis Ann, 1973, pp 21-22).

III

95 A.D.2d 442, *450; 467 N.Y.S.2d 203, **208; 1983 N.Y. App. Div. LEXIS 19637, ***17

The preserved error to which we have referred was the improper cross-examination of Roy Surprise. During his cross-examination -- and in the face of timely objections -- Surprise was subjected to repeated questioning concerning arrest warrants and **[**209]** criminal charges, even though it was not shown that he ever had been convicted of a crime and there was no determination of any underlying immoral conduct. The trial record is illustrative:

Q You are not a stranger to a courtroom, are you, sir? You have been in a courtroom on more than several occasions, right?

A To pay traffic tickets.

Q You have done more than that.

Following an objection, the court ruled that counsel should "not get into side matters at this point", but a few moments later, counsel continued the inquiry:

Q Mr. Surprise, you are really not a stranger to a courtroom; is that right? I mean, you have been in courtrooms before and you have testified before?

Mr. Malerba [plaintiffs' attorney]: Objection, your Honor. **[***18]** He is purposely trying to say things he knows he can't get in.

Mr. Clifford [defendant's attorney]: Oh, really.

The Court: Well, we have been through this before, but I am not going to preclude counsel from continuing along this line providing that we don't go too far afield into collateral matters. You may proceed, counselor.

**[*451]** Q Mr. Surprise, with regard to your background, you have the background which let me put it this way, you are not exactly pleased with police departments in general; isn't that right?

Mr. Malerba: Objection, your Honor.

The Court: I am going to sustain the objection to the form of that question, counselor.

Q Well, sir, on more than one occasion you have had warrants out for your arrest; isn't that right?

Mr. Malerba: Your Honor, that is completely out of line, totally out of line.

The lawyers then accompanied the Trial Judge into the robing room where defense counsel argued that he desired to prove the witness' bad reputation for truth and

veracity. The court permitted counsel "to explore this area to some extent" but not if the arrests did not involve convictions. Plaintiffs' request for a curative instruction was denied.

In the courtroom, **[***19]** defense counsel continued:

Q Mr. Surprise, you have appeared in court on more than several occasions before testifying in this case; isn't that right?

A I would say yes.

Q And when you say you would say yes, it's included a number of different allegations, if you will.

Mr. Malerba: If your Honor please --

Q. Isn't that true?

Mr. Malerba: Objection.

The Court: As to what specifically, counselor?

Mr. Malerba: Allegations. He is trying to infer something to the jury.

Mr. Clifford: I would, to point out that this man is certainly not a stranger to a courtroom.

Mr. Malerba: Here we go, your Honor.

The Court: I will reserve on the objection. We will see where we are going. I can't anticipate here. You may proceed, counselor.

A In relation to Dorothea Eggart, she took me to court and after trial she lost the case and I was completely exonerated after trial * * *

Q Did she bring a charge against you?

Mr. Hayes [plaintiffs' attorney]: Objection.

"A She brought --

**[*452]** Mr. Clifford: (Interposing) He just said it. I didn't ask him that.

The Court: There is no conviction here.

Mr. Clifford: I will ask it a different way.

The Witness: No conviction after trial.

**[***20] [**210]** The Court: Very well, let's go on.

Q That was not a civil case, is that right?

Mr. Malerba: Your Honor, you said go along, and he is back in it again.

Mr. Clifford: Can I ask him what kind of a case it was?

Mr. Malerba: If the man is exonerated, certainly all of this is before the jury and this is ludicrous.

The Court: Just a moment. I thought I carefully spelled out the limits in Chambers and on the record. I am going to sustain the objection to the form of the last question.

Q Were you represented -- you were represented by counsel on that matter; is that right?

A Yes.

Q And isn't it a fact that that was the firm of Kelly & Jiras? [plaintiffs' law firm].

A No. That is not a fact.

Q Have you been represented by Kelly & Jiras on some of your other matters?

A Never. I never knew them before the time they called me. That was a lover's spat by the way.

Q Have you been in court on other matters involving lover's spats?

A Traffic tickets.

Q Warrants as a result of traffic violations?

Mr. Malerba: Directly opposite your ruling, your Honor. In direct --

Mr. Clifford: (Interposing) That's not true, Judge.

The Court: You will remember what we discussed [***21] in Chambers.

Mr. Clifford: I do indeed.

The Court: And limit yourself thereby, counselor. I am going to sustain the objection to the form of the last question.

Surprise's cross-examination violated the rules applicable to impeachment and it was clearly prejudicial. *HN8*[⬆] Under *CPLR 4513*, conviction of a crime and the underlying facts of the criminal acts may be used to impeach the credibility **[*453]** of a witness at a civil trial ( *Moore v Leventhal, 303 NY 534*; *Able Cycle Engines v Allstate Ins. Co., 84 AD2d 140*). Impeachment based on

an arrest or indictment alone is improper, however, since they involve mere accusations of guilt ( *People v Morrison, 195 NY 116*; *People v Coyne, 73 AD2d 628*; *Landt v Kingsway Equip. Leasing Corp., 159 NYS2d 453*, affd *4 AD2d 785*; Richardson, Evidence [Prince, 10th ed*], § 506*). *HN9*[⬆] While a cross-examiner may not inquire concerning an indictment or arrest, there may be good-faith inquiry concerning a specific immoral, vicious or criminal act, if there is a reasonable factual basis for it ( *People v Greer, 42 NY2d 170*; *McQuage v City of New York, 285 App Div 249*; Richardson, Evidence [Prince, 10th ed], § 499). Here, however, **[***22]** counsel's repeated attempts to impeach the witness based upon arrest warrants and criminal charges were not accompanied by any showing that there had been convictions based on these accusations, and no foundation was laid for evidence of any specific acts of misconduct. This prejudice was compounded by the court's initial rulings in defendant's favor and its failure to give a curative instruction as requested by plaintiffs' attorney. Since Surprise's testimony was very important if believed, his credibility or lack of it was a crucial factor in the case. The method by which he was impeached was an error grave enough in scope to have potentially affected the verdict and to warrant consideration of the charge error which itself warrants reversal.

Accordingly, the judgment should be reversed and a new trial granted.

Judgment of the Supreme Court, Suffolk County, entered July 15, 1981, reversed, on the law and in the interests of justice, and new trial granted, with costs to abide the event.

---

**End of Document**