UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHAIM MEYER KLEIN, an individual and : | | |
| MORDECAI KLEIN, an individual, : | | |
| On behalf of all those similarly situated, : | | |
| : | | |
| Plaintiffs, : | | |
| : | | |
| vs. : | CASE NO.:  1:22-cv-02957 | |
| : | | |
| DEUTSCHE LUFTHANSA AG d/b/a : | AMENDED CIVIL COMPLAINT | |
| LUFTHANSA AIRLINE, FRANKFURT : | | |
| AIRPORT, FRAPORT AG : | | |
| FRANKFURT AIRPORT : | | |
| SERVICES WORLDWIDE, FRAPORT : | DEMAND FOR JURY TRIAL | |
| NEW YORK, INC., and FRAPORT USA : | | |
| INC. : | | |
| Defendants : | PUTATIVE CLASS ACTION | |
| : | COMPLAINT | |
| _____ : | | |

## FIRST AMENDED COMPLAINT

**COMES NOW,** Plaintiffs MORDECAI KLEIN and CHAIM MEYER KLEIN (the "Proposed Lead Plaintiffs") on behalf of all those similarly situated, through legal counsel, SCOTT LEVENSON, ESQ., LEVENSON LAW GROUP, and brings this action based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigations of their attorneys. The Proposed Lead Plaintiffs file this Complaint on behalf of themselves and all other consumers so situated, and state as follow.

## I. OVERVIEW

1.  On May 4, 2022, Plaintiffs Mordecai Klein and Chaim Meyer Klein (collectively, "Proposed Lead Plaintiffs"), boarded Lufthansa Flight 401 from JFK Airport in New York, which was scheduled to fly to Frankfurt Airport in Germany (the "First Flight").

2.  Later, also on May 4, 2022, Proposed Lead Plaintiffs were scheduled to connect with Lufthansa Flight LH1334 from Frankfurt, Germany to Budapest, Hungary (the "Second Flight").

3.  Proposed Lead Plaintiffs are adult Jewish individuals who purchased, planned for, and ultimately boarded the First Flight to travel to a small village in northeast Hungary for an annual memorial commemorating a Rabbi Yeshaya Steiner of Kerestir, who died in 1925 (the "Rabbi Memorial").

4.  Approximately 170 additional Jewish people flew on the First Flight to Frankfurt (together, Proposed Lead Plaintiffs and the additional Jewish people are referred to herein as either the "Proposed Class Plaintiffs" or the "Rabbi Memorial Attendees").

5.  However, they were prevented from completing their trip to Hungary, as they were barred from boarding the Second Flight, barring them from attending the Rabbi Memorial.

6.  There is only one reason why the Rabbi Memorial Attendees were prevented from continuing their trip to Hungary: *racial profiling* and *discrimination* against a large group of Jewish individuals by a German airline (Lufthansa) at a German airport (Frankfurt Airport) operated by another German company, Arbeit Macht Frei.

## II.  PARTIES

7.  Plaintiff Mordecai Klein is an individual residing in the Eastern District of New York.

8.      Plaintiff Chaim Meyer Klein is an individual residing in the Eastern District of New York.

9.      Defendant Deutsche Lufthansa AG d/b/a Lufthansa Airlines is, upon information and belief is located at Venloer Strasse 151-153 Koein, 50672 Germany with Lufthansa and has Headquarters located in Cologne, Germany and headquarters located at P.O. Box 425, East Meadow, New York, New York 11554 USA.

10.     Defendant Frankfurt Airport is an international airport in Germany (Code FRA), with an address of 60547, Frankfurt am Main, Germany.

11.     Defendant Frankfurt Airport is operated by Defendant Fraport AG Frankfurt Airport Services Worldwide.

12.     Defendant Fraport AG Frankfurt Airport Services Worldwide ("Fraport", "Fraport Group") is a German business "group" with headquarters at 60547 Frankfurt / Main Germany.

13.     Defendant Fraport USA Inc. is a Delaware Corporation with service of process address located at 651 N Broad St. Suite 201, Middletown, DE 19709.

14.     Defendant Fraport New York, Inc. is a Delaware Corporation with service of process address located at 1967 Wehrle Drive, Suite 1-086, Buffalo, NY, 14221and New York Liberty International Airport TB.

### III. JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction over the claims of this legal action because the matter in controversy exceeds the sum of $5 million, exclusive of interest and costs; Proposed Lead Plaintiffs and, upon information and belief, the other Rabbi Memorial Attendees are residents of the area of jurisdiction, and Defendants regularly conduct business in the New York area and have established "headquarters" in the New York area.

16.     The Court has personal jurisdiction over Defendants Deutsche Lufthansa AG and Fraport Group because Plaintiffs' claims arise out of the business activities of those Defendants conducted in the State of New York.

17.     Additionally, Defendant Frankfurt Airport is operated by Fraport.

18.     Venue is proper because Defendants conduct a significant amount of business in this district and because Defendants have substantial contacts in this District.

## IV. ALLEGATIONS COMMON TO ALL COUNTS

19.     Plaintiffs' destination was Budapest.

20.     They were traveling from JFK International Airport to Frankfurt Airport, and ultimately arriving in Budapest on Lufthansa FL401/LH1334.

21.     Plaintiffs' destination was part of an annual "memorial pilgrimage" commemorating Rabbi Yeshaya Steiner of Kerestir, who died *3 Iyar yahrzeit* (May 4th) in 1925.

22.     Reb Shayala Kerestirer ("R'Shayele") was known for kindness, warm hospitality and for his miraculous blessings.  The stories of his miraculous blessings could "revive" individuals – even to present day.  The true gift of R'Shayele was his ability to help people who had "lost their way" in the Jewish world. R'Shayele helped people to find themselves again to continue on in life with purpose.

23.     Kerestir, Hungary had a tiny Jewish community that was almost completely wiped out in the Holocaust.

24.     After a two-year hiatus, due to the pandemic and travel bans worldwide, *tens of thousands* were expected to Mark the Yahrzeit of Rabbi Yeshaya of Kerestir.

25.     On May 4, 2022, the travelers began their trip from JFK International Airport on Flight 401, the first leg of the flight.

26.     The pilot announced that the flight attendants were frustrated with passengers who were refusing to comply with the mandatory mask requirement and with people blocking the aisles to pray.

27.     German carrier, Lufthansa, requires passengers and crew to wear a medical-grade mask on flights.

28.     Although masks are no longer mandated on U.S. airlines and airports, they are still suggested when around large groups of people in tight areas.

29.     The mask mandate at Frankfurt Airport expired in early April 2022.

30.     Lufthansa Airline, as it had the right to do, continued with its mask requirements.

31.     At least three passengers in economy class were reprimanded on the First Flight by flight attendants because the passengers had refused to wear masks. One was Jewish and wearing a baseball cap. **The others were a man and a woman seated together and speaking German.**

32.     It is important to note that **Proposed Lead Plaintiffs, and many other Jewish travelers, complied with the mask requirements of Lufthansa Airlines.**

33.     Upon arriving at the gate in Frankfurt, passengers from the First Flight, including Proposed Lead Plaintiffs observed about 2 dozen police officers.

34.     Upon information and belief, it is believed that the police officers were there to enforce the Lufthansa Airlines mask requirements because *some* passengers had removed their masks during the First Flight.

35.     The Federal Police at Frankfurt claimed stated in an email that their presence was "preventative," and no one was arrested or detained from the originating flight because the officers were unable to identify the travelers who had flouted the rules.

36.     The Rabbi Memorial Attendees, including Proposed Lead Plaintiffs, were anticipating the Second Flight and the Lufthansa desk began calling passenger's names to board.

37.     Individuals who did not appear to be Jewish or did not appear to have Jewish names were allowed to board, these included non-Hasidic-Jew-appearing-passengers who had flouted the mask rule were allowed to board the plane and continue their travels.

38.     The Rabbi Memorial Attendees, including Proposed Lead Plaintiffs, whose names was not "outwardly" Jewish were called and then rejected after they were seen – and it was determined by their dress and appearance (the unique appearance of the Hasidic Jew) that they were Jews.

39.     The Rabbi Memorial Attendees, including Proposed Lead Plaintiffs, who were on their way to the Rabbi Memorial in Hungary, received the announcement stating that the remaining travelers would not be included on the flight and the travelers were banned from the airline for the day.

40.     Chaos ensued as the Jewish travelers attempted to make new plans under the time constraints of the Rabbi Memorial.

41.     A security guard was posted by the customer service counter to keep the Jewish travelers away for the remainder of the day.

42.     On May 4, 2022, Proposed Lead Plaintiffs experienced racing heart beats, nausea, sweating, and cramping, some of which periodically return up and through the date of this matter.

43.     Proposed Lead Plaintiff experience various injuries that stem from their experience at the Frankfurt Airport, including emotional, psychological, and other injuries.

44.    Now, it is hard to tell whether the racing heart beats, nausea, sweating, cramping, flashbacks, and memories cause their emotional states, or – vice versa, whether after experience physical symptoms, the memories return to Lead Plaintiffs.

45.    What they do know is that the bodily changes occurred after they were denied the ability to embark on the flight to Hungary, and that to this day symptoms remain reflecting their injuries (physical, mental, and emotional).

46.    Lufthansa spokesperson Tal Muscal stated that he did not know who made the decision to bar passengers from their connecting flight.

47.    A video posted online offers the explanation a Lufthansa gate agent provided when the connecting flight departed, leaving behind three-quarters of its passengers: "Due to an operational reason coming from the flight from New York, all passengers here, we have to cancel you on this flight," the agent said.  **"You know why it was."**

48.    What the Rabbi Memorial Attendees, including Proposed Lead Plaintiffs, know is that they were met with (a) police force upon arriving in Frankfurt, Germany; (b) they were singled out by being called by name, looked over by Defendants' representatives, and then denied the opportunity to board the Second Flight because they appeared as Hasidic Jews; and that they were forced to not only incur additional financial expenses but also faced humiliation, anxiety, emotional anguish, and other psychological trauma as explained further in the following paragraph.

49.    Another video shows passenger Yitzy Halpern speaking with a Lufthansa employee in customer service.  Halpern is wearing a dark, long-sleeve shirt with a yarmulke (a skullcap) on his head.  "I was wearing a mask the whole time," Halpern said, "Why am I lumped in with them?"  The Lufthansa representative replied, **"Everybody has to pay for a couple"** who didn't comply

with mask rules. **"It was Jewish people who were the mess, who made the problems."** Halpern, whose grandparents were Holocaust survivors, told the representative that picking out all Jews was "gruesome" and antisemitic. The Lufthansa representative replied, **"It would have been [the same] if you were African or Polander."**

50.     It is important to discuss the history and current situation facing many Jewish people to fully understand the distress that these actions caused the , as well as their fellow Jewish travelers. There are many groups of individuals that would have received widespread public, and even government, support had they been barred from traveling based only upon belonging to that specific group. Unfortunately, as the era of a Second Holocaust falls upon us, there is "Silence" once again. The world stands still, doesn't make a sound. Standing up for Jews in the face of Blatant Antisemitism is not politically popular for a vast majority of the public, as well as many of our elected officials, even the so-called Jewish ones.

51.     Jewish Kapos played a pivotal role in the history of the Holocaust. Imprisoned in concentration camps, Kapos were enemies and victims of the Nazis; they were **Jewish inmates who were forced by the Nazis to serve as "stand-in" guards**. In effect, being a Kapo blurred the lines between collaborator, perpetrator, and victim. We find that that line is once again blurred with Jewish elected officials in Congress and the Senate. They no longer have their own identity but speak up on behalf of many other groups involving hate and discrimination in this country if it will ensure they keep their seat. Speaking up about hate and discrimination for their own people is not politically correct at this time in history and might affect their positions, so they let it go, until of course the mob comes for them and then there is no one left to speak up.

52.     The Rabbi Memorial Attendees, including Proposed Lead Plaintiffs , knowing they would be prevented from continuing their trip on Lufthansa LH1334 attempted to take alternative

routes, paying hundreds of dollars for new flights on LOT Polish Airlines, buses, taxis, etc.  Some would re-book on other Lufthansa flights after paying a fare difference **because Flight 1334 had not been cancelled, they had just been prevented from boarding the Second Flight because they are Jewish.**

53.    Many of the Rabbi Memorial Attendees, including Proposed Lead Plaintiffs, arrived at their destination too late for the Rabbi Memorial.

54.    Many of the Rabbi Memorial Attendees, including Proposed Lead Plaintiff, had to pay for a new flight home, since they had not completed the outbound flight on Lufthansa – invalidating their return ticket.

55.    The memorial ceremony for Rabbi Yeshaya Steiner of Kerestir will inevitably continue in the coming years.  R'Shayele, his actions, memories and stories continued to produce such miraculous results so many years after his passing.

56.    However, the actions of Defendants have come at a time in history where Antisemitism is at its highest level since WWII and recent studies suggest that over 60% of Jews believe that there will be another Holocaust in their lifetime. This Antisemitism also came from German Corporations who notoriously used Jews as Slave Labor during the Holocaust and of course this Antisemitic episode came from people speaking German, which furthered the trauma caused by and related to this incident, a very real reminder that Arbeit Macht Frei and the Hitler Youth is alive and well.

57.    The Holocaust still triggers such fear and anger so many years after the war's conclusion. As the children and grandchildren of those survivors have relived those horrors with their Parents and Grandparents.

58.     This is Antisemitism through racial and religious profiling and disrupted a memorial celebration – a ceremony in memory of a kind and inspirational person.

59.     Plaintiffs bring this action on behalf of themselves, and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

60.     There is a well-articulated, defined community of interest in the questions of law and fact affecting the proposed Class, and they predominate over questions that may affect only individual the Class members:

   a.   Whether Defendants discriminated against and harassed Proposed Lead Plaintiffs and Rabbi Memorial Attendees (proposed Class members) because they are Jewish, violating not only anti-discrimination laws, but also violating the Montreal Convention;

   b.   Whether Defendants unlawfully and wrongfully caused the proposed Class members intentional infliction of emotional distress in violation of the Montreal Convention;

   c.   Whether Defendants unlawfully and wrongfully materially breached the contracts (which are likely identical) between Defendants, on the one hand, and the proposed Class members, on the other, in violation of the Montreal Convention;

   d.   Whether Defendants' material breach of the contracts caused proposed Class Members harm, in violation of the Montreal Convention;

   e.   Whether Defendants' discriminatory conduct violates New York law and/or the Montreal Convention;

f.   Whether Defendant was unjustly enriched at the proposed Class Members' expense, in violation of the ; and

g.   Whether Class Members have been damaged, and if so, the appropriate measure of such damages.

61.     Plaintiffs bring this action on behalf of themselves and a class of all similarly situated consumers against Defendants, arising from a systematic effort Defendants' agents and employees to discriminate and harass Proposed Lead Plaintiffs and Rabbi Memorial Attendees to prevent them from attending the Rabbi Memorial and to extract additional fees from them, the discriminating and harassing acts include but are not limited to:

a.   Ordering that armed guards and/or police officers monitor the First Flight passengers while they sought to connect to the Second Flight;

b.   Singling out Hasidic Jewish people one by one by calling out their names to embarrass, harass, and prevent them from attending the Rabbi Memorial in Hungary;  and

c.    Prevented Jewish people from boarding the Second Flight, causing them to incur additional travel costs including (i) alternative travel to Hungary and (ii) rebooking return flights, some of which extracted additional fees from the Jewish people for Defendants' benefit.

62.     Defendants' conduct outlined herein together increase Defendants' profits while extracting funds rightfully belonging to consumers (namely, the Rabbi Memorial Attendees).

63.     Defendants' discriminatory conduct not only caused the proposed Class Plaintiffs financial harm, but also humiliation, anguish, anxiety, and other trauma.

64.     The Proposed Classes are defined as:

**Class 1** All First Flight 1 (May 4, 2022 Lufthansa Flight 401)  Jewish Passengers prevented from flying on Flight 2 (May 4, 2022 Lufthansa Flight LH1334).

**Class 2** All Flight 1 Jewish Passengers who incurred additional travel costs to Hungary.

**Class 3** All Flight 1 Jewish Passengers who incurred additional travel costs for having to purchase and/or rebook return flights at additional costs to them.

**Proposed Class Representatives** for all Classes: Plaintiffs Chaim Meyer Klein and Mordecai Klein.

65.     Proposed Class Members have wrongfully been discriminated against and harassed by Defendants.

66.     Named Plaintiffs are committed to prosecuting the action vigorously and have competent counsel experienced in litigation of this nature, discriminatory and at the federal level.

67.     Named Plaintiffs and other Class members have suffered damages because of Defendants' wrongful conduct.

68.     Due to the size of the claims of the individual members of Class, few, if any could afford to seek legal redress for the wrongs complained of herein.

69.     The individual prosecution of the claims on an individual basis would create a risk of inconsistent and contradictory adjudications in connection with each Class member's claim.

70.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

71.     Absent a class action the Class members will not obtain redress for their injuries and Defendants will unjustly retain the proceeds of its statutory and common law violations and wrongs.

**V.  LEGAL BASES FOR RELIEF**

**COUNT I**
**All Defendants – Discrimination based on Race**
**False Imprisonment – Bodily Injury Montreal Convention—¶17**

72.     Plaintiffs incorporate by reference the preceding paragraphs as if more fully set forth herein.

73.     Defendants intended that Lead Plaintiffs and other proposed Class members be confined to the Frankfurt Airport.

74.     Lead Plaintiffs were conscious of the confinement.

75.     Lead Plaintiffs did not consent to the confinement.

76.     Defendants were without a privilege to the confinement as it was based upon Lead Plaintiffs' and other Class members' Jewish appearance and Defendants' anti-Semitism as described above.

77.     That this anti-Semitism is being revived should not be tolerated as expressed on December 11, 2019, President Trump issued an executive order stating in section one that, "It shall be the policy of the executive branch to enforce Title VI against prohibited forms of discrimination rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI."

78.     This executive order continues in section two by stating, "Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews.  Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."

79.     As an ethnoreligious group, the Jewish people traveling on the First and Second Flights (Lufthansa FL 401/1334) were discriminated as a race of people who were being prevented, as a group, from flying on their connecting flight from Frankfurt Airport to Budapest, Hungary.

80.     Defendants breached their duties and violated applicable laws by intentionally profiling the Rabbi Memorial Attendees based off their race and national origin thereby preventing Proposed Lead Plaintiffs and other Jewish travelers from continuing with their flight from Frankfurt Airport to Budapest, Hungary solely because they were Jewish – and especially because many of them were Hasidic Jews.

81.     Defendants intentionally continued with their discriminatory actions and inactions after it was determined their behaviors towards the Plaintiffs and other Jewish travelers was not substantiated.

82.     Defendants provided a hostile environment towards the Jewish travelers by bringing in armed security and police presence for the sole purpose of containing the Jews and preventing them from continuing to the connecting flight to their final destination in Budapest, Hungary.

83.     An employer is vicariously liable for its employee's negligent or intentional acts if those acts are committed within the scope of the employee's employment, and the conduct is generally foreseeable and a natural consequence of the employment. *Adams v. NYC Tr. Auth.,* 88 N.Y.2d 116 (1996*)*. This vicarious liability is expanded even further for common carriers for the torts committed by their employees as carrier's have an "implicit contract with its passengers, which was held, as a matter of law, to require the carrier to transport its passengers "`safely and properly, and to treat [them] respectfully'" *Id. citing Goddard v Grand Trunk Ry*., 57 Me 202).

84.     The harassment towards the Jewish travelers was motivated by race and religion and the conduct of the employees was pervasive and severe.

85.     Defendants' conduct, through their employees, had a detrimental effect on Proposed Lead Plaintiffs and the harassment would have had a significant effect on a reasonable person of the same (or any) religion in the position.

86.     Plaintiffs' injuries are outlined above and will be proven by experts concerning same during the litigation of this matter.

87.     Plaintiffs' injuries constitute bodily injury pursuant to the Montreal Convention, ¶17, and accordingly Plaintiffs are entitled to recover for same due to Defendants' discriminatory and tortious actions.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count I of the Complaint against all Defendants in compensatory damages in an amount that is fair and reasonable to compensate Plaintiffs for their damages, including but not limited to the recoupment of all monies paid, treble damages, costs of the suit, and reasonable attorney's fees and costs.

**COUNT II**
**All Defendants – Discrimination based on Race**
**False Imprisonment – Delay- Montreal Convention—¶19**

88.     Plaintiffs incorporate by reference the preceding paragraphs as if more fully set forth herein.

89.     Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on religion. As an ethnoreligious group, the Jewish people traveling on Lufthansa FL 401/1334 were discriminated as a race of people who were being prevented, as a religious group, from flying on their connecting flight from Frankfurt Airport to Budapest, Hungary.

90.     Defendants breached their duty by preventing Jewish travelers from continuing with their flight from Frankfurt Airport to Budapest, Hungary solely because they were Jewish – and especially because they were Hasidic Jews.

91.     Defendants were negligent by continuing with their discriminatory actions and inactions after it was determined their behaviors towards the Jewish travelers was not substantiated.

92.     Defendants provided a hostile environment towards the Jewish travelers by bringing in armed security and police presence for the sole purpose of containing the Jews and preventing them from continuing to the connecting flight to their final destination in Budapest, Hungary.

93.     Defendants are responsible for the actions of their employees.

94.     The harassment towards the Jewish travelers was motivated by race and religion and the conduct of the employees was pervasive and severe.

95.     Defendants' discriminatory conduct, through their employees, had a detrimental effect on the Proposed Lead Plaintiffs and the harassment would have had a significant effect on a reasonable person of the same religion in the position, including the other Rabbi Memorial Attendees who traveled on the First Flight or other Jewish people who travel on Defendants' common carriers and who are harassed by Defendants.

96.     Defendants' discriminatory conduct, through their employees, caused passenger delays as outlined herein that violate the Montreal Convention, ¶19.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count II of the Complaint against all Defendants in compensatory damages in an amount that is fair and reasonable to compensate the Plaintiffs for their damages, including but not limited to the recoupment of all monies paid, treble damages, costs of the suit, and reasonable attorney's fees and costs.

**COUNT III**
**All Defendants – Anti-Semitism (Racial Bias)**
**Negligence - Violation of New York Common Law for Injuries Sustained After Denial of (Dis)Embarking**

**Statutory Violations -U.S.C. §§ 2731 & 6412 and 49 U.S.C. §40127**

97.     Plaintiffs incorporate by reference the preceding paragraphs as if more fully set forth herein.

98.     The Department of State houses an *Office to Monitor and Combat anti-Semitism* under 22 U.S.C. § 2731, which provides that the Special Envoy shall have the rank of Ambassador and advise and coordinate efforts to monitor and combat anti-Semitism and anti-Semitic incitement that occurs in foreign countries.

99.     The nature and extent of acts of anti-Semitism and anti-Semitic incitement are described and assessed for inclusion in the annual Country Reports on Human Rights Practices.

100.    Anti-Semitism is assessed and reported under 22 U.S.C. § 6412 regarding violations of religious freedom in any foreign country.  Violations include (A) arbitrary prohibitions on, restriction of, or punishment for – (i) assembling for peaceful religious activities such as worship, preaching and prayer; (ii) speaking freely about one's religious beliefs.

101.    Proposed Lead Plaintiffs, and most of the other travelers (namely, the Rabbi Memorial Attendees) on the First and Second, were Jews and most were distinguished by their dress and hair "locks" (pe'ot, payot, or payes) as Hasidic Jews.

102.    They were separated from the other travelers like sheep, blocked by the shepherds (armed police) and not allowed to fly on the previously ticketed Lufthansa flight to Budapest, Hungary.

103.    Jewish travelers who attempted to continue to their destination on other Lufthansa flights were charged **extra fees** and not given credit for "return tickets."

104.    Additionally, the federal government has enacted the Air Deregulation Act, which prohibits the discriminatory conduct outlined herein.

105. Defendants' discriminatory conduct, through their employees, have violated the federal Air Deregulation Act's anti-discriminatory conduct.

106. Defendants' discriminatory conduct complained of by Proposed Lead Plaintiffs on behalf of themselves and the proposed Class members violates various duties imposed by statutes, including 49 U.S.C. § 40127(a),  and 22 U.S.C. §6412.

107. Defendants' discriminatory conduct breach of those duties owed to Plaintiff, causing various injuries and damages to Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count III of the Complaint against all Defendants in compensatory damages in an amount that is fair and reasonable to compensate the Plaintiffs for their damages due to the anti-Semitic actions and inactions, including but not limited to the recoupment of all monies paid, treble damages, costs of the suit, and reasonable attorney's fees and costs.

## COUNT IV
### All Defendants – Intentional Infliction of Emotional Distress
### Violation of New York Law for Injuries Sustained After Denial of (Dis)Embarking

108. Plaintiffs incorporate by reference the preceding paragraphs as if more fully set forth herein.

109. Under New York law, a party who has been subjected to "'conduct . . . so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community'" is entitled to prove a claim for intentional infliction of emotional distress. *Murphy v. Am. Home Products Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236 (1983) (*quoting* Restatement (Second) of Torts § 46, subd. [1], Comment d); *Fischer v. Maloney*, 43 N.Y.2d 553, 557-58, 402 N.Y.S.2d 991, 992-93

(1978) (acknowledging a cause of action for intentional infliction of emotional distress in New York).

110.    To recover for intentional infliction of emotional distress, a plaintiff must establish four distinct elements, including 1) extreme and outrageous conduct; 2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; 3) severe emotional distress; and 4) a causal connection between the conduct and a cognizable injury. *Howell v. New York Post Co., Inc*., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353 (1993).

111.    In this action, it has been documented that Defendants held Proposed Lead Plaintiffs as well as a group of Jewish travelers (viz., the Rabbi Memorial Attendees) with them at bay, assisted by security and police armed with guns-ready, for the sole purpose of harassing and discriminating against Plaintiffs and proposed Class members not only preventing the Jewish travelers from completing the second, and final leg., of their journey to the Rabbi Memorial, but it continued on, confining them to the Frankfurt Airport.

112.    The discriminatory conduct continued on after the alleged "embarking" or "disembarking" (which never occurred in the second leg /Second Flight) with Defendants' requested police force remaining present, preventing Plaintiffs and proposed Class members from moving about freely.

113.    The prevention occurred through the presence of police force with (veiled) threats of violence.

114.    This behavior was extreme and outrageous and Defendants, through its agents and employees, disregarded the substantial probability that this would cause severe emotional distress to Proposed Lead Plaintiffs.

115.    Proposed Lead Plaintiffs and the Rabbi Memorial Attendees with them were individuals who became a group due to their common destination and their common purpose – to commemorate the life of an inspirational person.

116.    Due to the deliberate actions and inactions of Defendants, Proposed Lead Plaintiffs, and many of the other Jewish travelers would arrive after the ceremony had concluded – or not at all.

117.    As a result of the Defendants extreme and outrageous behavior, co-Lead Plaintiffs have experienced severe emotional distress, particularly given the spiritual connection with fellow Jewish travelers and the historical treatment of the Jewish people, specifically within Germany.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count IV of the Complaint against all Defendants in damages for emotional distress caused by Defendants in their anti-Semitic "exercise" on May 4th, 2022.

## COUNT V
### All Defendants – Breach of Contract
### Violation of New York Common Law for Injuries Sustained After Denial of (Dis)Embarking

118.    Plaintiffs incorporate by reference the preceding paragraphs as if more fully set forth herein.

119.    Proposed Lead Plaintiffs entered into an enforceable agreement with Defendants upon purchase of their airline ticket wherein they paid money to purchase said ticket, thereby fulfilling their obligations under the contract.

120.    Plaintiffs dd so with the understanding that Defendants would fulfill their obligation to ensure that Plaintiffs would be able to fly to their destination as scheduled, absent unforeseen circumstances beyond Defendants' control.

121.    Defendants materially breached this agreement when they refused to allow Proposed Lead Plaintiffs and the Rabbi Memorial Attendees to fly to their destination, even though was within Defendants' control to do so, and Proposed Lead Plaintiffs had not violated any policy of the airline.

122.    Defendants did not perform their contractual obligations.

123.    As a result of Defendants' material breach of contract, Proposed Lead Plaintiffs incurred damages including actual damages, the cost of their airline ticket, and consequential damages.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count V of the Complaint against all Defendants in damages caused by Defendants in their anti-Semitic "exercise" on May 4th, 2022.

**COUNT VI**
**All Defendants – Unjust Enrichment**
**All Defendants – Intentional Infliction of Emotional Distress**
**Violation of New York Common Law for Injuries Sustained After Denial of (Dis)Embarking**

124.    Plaintiffs incorporate by reference the preceding paragraphs as if more fully set forth herein.

125.    Proposed Lead Plaintiffs and the other Class members were and/or are in a direct relationship with Defendants through their flying on the First Flight.

126.    Proposed Lead Plaintiffs and the other Class members were and/or are in direct relationship with Defendants through their purchase of tickets concerning the Second Flight.

127.    By discriminating against Proposed Lead Plaintiffs and the other Class members because they are Jewish, through their prevention of allowing the Class members to fly on the

Second Flight, Defendants caused some Class members to be forced wrongfully to purchase additional tickets from Defendants (both to Hungary, and return flights)

128.     Defendants have retained the benefits of the purchase of the additional tickets and other fees paid by Class members at the expense of Proposed Lead Plaintiffs and other Class members.

129.     Defendants' retention of the benefits is unjust.

130.     This unjust enrichment occurred after the alleged "embarking" and/or "disembarking" was completed.

131.     As a result, Defendants have caused and continue to cause Proposed Lead Plaintiffs and the other Class Members damages.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count VI of the Complaint against all Defendants in damages caused by Defendants in their anti-Semitic "exercise" on May 4th, 2022.

**COUNT VII**
**All Defendants – Punitive Damages**
**Violations of New York and Federal Common Law for Injuries Sustained After Denial of (Dis)Embarking**

132.     Plaintiffs incorporate by reference the preceding paragraphs as if more fully set forth herein.

133.     There exists a general standard that applies in connection with awards of punitive damages. *See Whitney v. Citibank, N.A.,* 782 F.2d 1106, 1118 (2d Cir. 1986) (citing *Walker v. Sheldon*, 10 N.Y.2d 401, 404-05, 223 N.Y.S.2d 488, 490-91 (1961)) (indicating that punitive damages are appropriately awarded in the event of a showing that a defendant's actions were willful, wanton and maliciously committed); *see also Luessenhop v. Clinton County*, New York,

No. 04-CV-263, 1007 WL 1063650, at *9 (N.D.N.Y. Apr. 6, 2007) (Treece, M.J.); *Lambrinos v. Exxon Mobil Corp*., No. 00-CV-1734, 2004 WL 2202760, at *8 (N.D.N.Y. Sept. 29, 2004).

134.    An award of punitive damages is intended to advance the important state interests of deterrence and retribution. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 1519 (2003).

135.    The factors to be considered when awarding punitive damages include "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (*quoting BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S. Ct. 1589 (1996)); *see also Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006).

136.    Punitive damages, or exemplary damages, are damages assessed  to punish a defendant for outrageous conduct and/or to reform or deter a defendant and others from engaging in conduct like that which formed the basis of the lawsuit.

137.    The record for the day at Frankfurt Airport on May 4th, 2022, demonstrates, through clear and convincing evidence, that Defendants were guilty of intentional misconduct of an anti-Semitic nature, in Germany and with armed guards and police in the wings.

138.    Defendants, through their employees and agents, sought to maliciously oppress a group of Jewish travelers on their way to a memorial ceremony.

139.    Defendants' behavior was egregious.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count VII of the Complaint against all Defendants in punitive damages in an amount of three million ($3,000,000.00) dollars per Plaintiff, plus costs of the suit, and reasonable attorney's fees and costs.

WHEREFORE, as litigation continues and discovery is conducted, Plaintiffs reserve their right to move for leave to amend to add counts and other theories of recovery.

Dated: September 1, 2022
New York, NY                                    Respectfully submitted,

*Scott C. Levenson*
_____
Scott Levenson, Esq.
Levenson Law Group
625 W. 51st Street
New York, NY  10019
Tel: 347-352-2470
LevensonLawGroup@gmail.com
Attorneys for Plaintiffs
Proposed Lead Counsel